*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0022P (6th Cir.)
File Name: 04a0022p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

JAMES A. LEWIS, doing
business as B&H Vendors;
PENN VENDING COMPANY;
EAGLE COIN MACHINE;
BELFIORE MUSIC &
CIGARETTE COMPANY; B&G
ENTERPRISES, LTD.; ALL
BRANDS VENDING CO., INC.;
CLASS A VENDING; C.I.C.
CORPORATION; MELO-TONE
VENDING, INC.; T.D. ROWE
CORPORATION,
      *Plaintiffs-Appellants,*

      *v.*

PHILIP MORRIS
INCORPORATED,
      *Defendant-Appellee.*

Nos. 01-6174/6502

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 99-00099—Thomas A. Higgins, District Judge.

Argued: April 30, 2003

Decided and Filed: January 15, 2004

Before: MOORE and ROGERS, Circuit Judges; KATZ,
District Judge.[*]

———————

## COUNSEL

**ARGUED:** John M. Shoreman, McFADDEN &
SHOREMAN, Washington, D.C., for Appellants. Jerome I.
Chapman, ARNOLD & PORTER, Washington, D.C., for
Appellee. **ON BRIEF:** John M. Shoreman, Douglas B.
McFadden, McFADDEN & SHOREMAN, Washington,
D.C., for Appellants. Jerome I. Chapman, ARNOLD &
PORTER, Washington, D.C., R. Dale Grimes, BASS,
BERRY & SIMS, Nashville, Tennessee, for Appellee. James
L. O'Connell, LINDHORST & DREIDAME, Cincinnati,
Ohio, for Amicus Curiae.

  ROGERS, J., announced the judgment of the court and
delivered an opinion, in which MOORE and KATZ,
concurred except as to Part II.B. MOORE, J. (pp. 32-41),
delivered a separate opinion, in which KATZ, D. J.,
concurred as to the issues addressed in Parts I and II, which
constitutes the opinion of the court on these issues.

———————

## OPINION

———————

  PER CURIAM. Judge Moore would reverse on all the
claims as to which the district court granted summary

---

[*] The Honorable David A. Katz, United States District Judge for the
Northern District of Ohio, sitting by designation.

judgment. Judge Rogers would affirm the summary judgment against plaintiffs who have purchased indirectly from defendant, but he would reverse summary judgment entered against plaintiffs who purchase directly from defendant. Judge Katz would find that all violations of the Act are properly analyzed under §§ 2(d) and (e) and not § 2(a), and thus would affirm summary judgment as to the § 2(a) claims on grounds alternative to those relied on by the district court. Summary judgment is therefore REVERSED on Count I as to all plaintiffs and on Count II as to those plaintiffs who purchase directly from defendant and AFFIRMED on Count II as to those plaintiffs who do not purchase directly from defendant, and the case is REMANDED for further proceedings.

ROGERS, Circuit Judge. This case involves the grant of summary judgment in favor of Philip Morris, Inc.[1] in a Robinson-Patman Act case. Cigarette vending machine owners and operators ("vendors") sued Philip Morris under section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (d), and (e) (the "Act"), alleging that Philip Morris had violated these provisions by failing to provide vendors with promotional fees and programs in the same manner that it provided such fees and programs to other retailers. The district court granted Philip Morris summary judgment, holding that eight out of ten of the plaintiff vendors did not have standing because they did not purchase cigarettes directly from Philip Morris, and, alternatively, no plaintiffs proved that they were in competition with the other retailers. I would hold that the vendors who did not purchase directly from Philip Morris

---

[1] Philip Morris, Inc. changed its name effective on January 15, 2003, to Philip Morris USA, Inc.

lacked statutory standing, but that the remaining plaintiffs who have standing are in competition with the other retailers.[2]

## I. BACKGROUND

A. *The Robinson-Patman Act*

The Robinson-Patman Act was passed in 1936 as an amendment to the Clayton Act.[3] The Clayton Act is an antitrust law that primarily protected against "primary line" price discrimination, or price discrimination tending to injure the price discriminator's competitors. 14 Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 2302 (1999) (*Hovenkamp*) ("[T]he concern with original § 2 of the Clayton Act was entirely with what we today would call 'primary-line' price discrimination."); *see also George Haug Co., Inc. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 141 n.2 (2d Cir. 1998) (defining primary-line price discrimination). In response to criticism that the Clayton Act did not protect small retail stores from the concentrated buying power of larger chain stores, Congress passed the Robinson-Patman Act. The reason for its enactment was to "curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *FTC v. Henry Broch & Co.*, 363 U.S. 166, 168 (1960). The Robinson-Patman Act protects against primary-line violations, *see, e.g.*, *FTC v. Anheuser Busch, Inc.*, 363 U.S. 536 (1960), and also, significantly for this case, against "secondary-line" violations, those that occur "when a seller's

---

[2] Judges Moore and Katz concur in this opinion except as to Part II.B.

[3] We must visit this statutory realm although "[n]o one, it appears, dwells longer than necessary in the land of Robinson-Patman." Hugh C. Hansen, *Robinson-Patman Law: A Review and Analysis*, 51 Fordham L. Rev. 1113, 1118 (1983).

discrimination impacts competition among the seller's customers; i.e., the favored purchasers and disfavored purchasers." *George Haug Co., supra.* The present case involves an alleged secondary-line violation because it is the competitors of the favored purchasers that are claiming discrimination rather than the competitors of Philip Morris.

B. *The Cause of the Controversy*

This case involves claims that Philip Morris discriminated against machine vendors of cigarettes in favor of another class of cigarette seller—convenience stores, mini-marts and gas stations (collectively referred to as "convenience stores"). On November 1, 1998, Philip Morris terminated a program, called Plan MV, under which it paid fees to vendors if they followed certain guidelines regarding the placement of advertising materials on their vending machines and the location of Philip Morris cigarettes in certain slots of the machines. Philip Morris thereafter instituted new programs for convenience stores that provided for price promotions, product promotions, and incentive promotions in exchange for the convenience stores' participation in the programs. Under the new price promotion programs, Philip Morris paid an amount of money to convenience stores for every carton or pack of Philip Morris cigarettes sold as long as the customer received a discount in an amount equal to the price promotion.[4] An example of a product promotion was one in which, if the consumer bought one pack, the consumer would get one pack free. With an incentive promotion, the stores were given gifts to give away to cigarette purchasers. These programs were called the Retail Masters, Retail Leaders and

---

[4] One example of a price promotion program took place after Philip Morris entered into a settlement with states' attorneys general that provided for a mandatory payment of 45 cents per pack sold into a settlement fund. Philip Morris increased the cost of its cigarettes by 45 cents, but Philip Morris agreed to rebate the 45 cents to convenience stores participating in promotional programs.

Ranch Party '99 Programs. Vendors allege that after the programs went into effect, vendors were unable to compete with the convenience stores' low prices, thereby incurring substantial losses.

C. *Statutory scheme*

Claiming that they are "in competition" with convenience stores, vendors alleged violations of sections 2(a), 2(d) and 2(e) of the Robinson-Patman Act. Section 2(a) prohibits a supplier from "discriminat[ing] in price between different purchasers of like grade and quality," where "the effect is substantially to lessen competition."[5] 15 U.S.C. § 13(a). Section 2(a) protects against direct and indirect price discrimination. *American News Co. v. FTC*, 300 F.2d 104, 109 (2d Cir. 1962). Direct discrimination occurs when a

---

[5] Section 2(a) provides in part:

(a) Price; selection of customers. It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . ., and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a). Although the statute refers to price discrimination, it has been interpreted to prohibit price differences. *F.T.C. v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549 (1960) (primary line case); *but see FLM v. Collision Parts, Inc. v. Fort Motor Co.*, 543 F.2d 1019 (2d Cir. 1976) (secondary line case holding that equality of treatment among purchasers does not require a single uniform price under all circumstances); *Edward J. Sweeney & Sons v. Texaco, Inc.*, 637 F.2d 105, 120 (3d Cir. 1980) (similar).

seller charges different prices to different buyers. *Robbins Flooring, Inc. v. Fed. Floors, Inc.*, 445 F. Supp. 4, 8 (E.D. Pa. 1977). Indirect discrimination occurs "when one buyer receives something of value not offered to other buyers," such as free goods. *Id.*

Section 2(a) applies only if "two or more consummated sales of commodities of like grade and quality are made at discriminatory prices by the same seller to two or more different purchasers contemporaneously or within the same approximate time period." Hugh C. Hansen, *Robinson-Patman Law: A Review and Analysis*, 51 Fordham L. Rev. 1113, 1127-28 (1983) (footnotes omitted). Therefore, to be able to sue under section 2(a), the plaintiff must be a "purchaser."

In a secondary-line section 2(a) case, the plaintiff who is the disfavored purchaser, must show that it competes with the favored purchaser. *O'Byrne v. Cheker Oil Co.*, 727 F.2d 159, 164 (7th Cir. 1984); *National Distillers & Chem. Corp. v. Brad's Mach. Prods.*, 666 F.2d 492, 496 (11th Cir. 1982); *M.C. Mfg. Co. v. Texas Foundries*, 517 F.2d 1059, 1066 (5th Cir. 1975). To show that the disfavored purchaser is injured, the disfavored purchaser and the favored purchaser must be in the same geographic market. *Hovenkamp* ¶2333b3.

Sections 2(d) and (e) of the Act deal with discrimination in the field of promotional services made available to purchasers who buy for resale. Where the seller pays the buyer to perform the service, Section 2(d) applies.[6] "Where the seller

---

[6]Section 2(d) provides:

(d) Payment for services or facilities for processing or sale. It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services

furnishes the service itself to the buyer, Section 2(e) applies."[7] *Kirby v. P.R. Mallory & Co.*, 489 F.2d 904, 909 (7th Cir. 1973) (quoting F.T.C. Guides for Advertising Allowances and Other Merchandising Payments and Services (1960)).

Among those "services and facilities" held to be within Sections 2(d) and 2(e) have been any kind of advertising, catalogs, demonstrators, display and storage cabinets, display materials, hand bills, special packaging or package sizes, warehouse facilities, accepting returns for credit, prizes or merchandise for conducting promotional contests, and "monetary awards" paid by the seller to

---

or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d). Section 2(d)'s prohibition includes "paying allowances for advertising or other sales promotion services or facilities." *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 209 (3d Cir. 1980); *see also American News Co.*, 300 F.2d at 109 ("Section 2(d) was aimed explicitly at promotional allowances which have the effect of price adjustments.").

[7]Section 2(e) provides:

(e) Furnishing services or facilities for processing, handling, etc. It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

15 U.S.C. § 13(e).

clerks, salesmen, and other employees of the customer
for special sales or promotional efforts.

*Cecil Corley Motor Corp.*, 380 F. Supp. at 850 (citation
omitted).   Sections 2(d) and (e) tend to be considered
together. *See Kirby*, 489 F.2d at 909 ("[Section] 2(e) has long
been viewed as coterminous with § 2(d), and courts have
consistently resolved the two sections into an harmonious
whole.").

In order to bring a private enforcement action under the
Robinson-Patman Act, the plaintiff must be a "purchaser" or
"customer." *See* §§ 2(a), (d), and (e); *Barnosky Oils, Inc. v.
Union Oil Co. of California*, 665 F.2d 74, 84 (6th Cir. 1981)
(finding that plaintiff that did not purchase directly from
defendant was not a "purchaser" under §2(a) of the Act).
Although section 2(d) refers to "customers" and section 2(e)
deals with "purchasers," the words in those two subsections
have been interpreted to have the same meaning. *Hovenkamp*
¶ 2363b.  Also, as with § 2(a), a plaintiff alleging a violation
of §§ 2(d) and (e) must show that the it competes with the
favored purchaser, and the competition must be in the same
geographic area. *George Haug Co., Inc.*, 148 F.3d at 145
(stating, in relation to section 2(d) and 2(e) claims, "[t]he
plaintiff must demonstrate that the goods or commodity apply
only to offers to customers competing in the same geographic
area").

D. *Proceedings below*

Vendors[8] filed suit against Philip Morris alleging that it had
violated sections 2(a), 2(d) and 2(e) of the Robinson-Patman
Act.  Vendors alleged (1) that Philip Morris did not offer the
promotional allowances and rebates to vendors on
proportionally equal terms as the convenience stores; (2) that
the prices paid by vendors were not proportional to the prices
paid by the convenience stores after taking into account the
rebates and promotional allowances; and (3) that Philip
Morris provided the convenience stores with advertising
services and materials without offering the same to vendors,
all in violation of sections 2(d) and 2(e).  Vendors further
alleged that Philip Morris committed price discrimination in
violation of section 2(a) by offering the rebates and
promotional allowances to the convenience stores without
making the offers available to vendors.

Philip Morris moved for summary judgment on the grounds
that (1) eight vendors did not purchase directly from Philip
Morris and the other two only purchased some of their
cigarettes from Philip Morris and therefore vendors did not

---

[8]This case began with over 200 vendors, but the district court entered
an order severing the claims of eleven vendors and consolidating those for
pretrial proceedings.   One vendor's claims were voluntarily dismissed,
leaving ten vendors in this appeal.  Those ten vendors are James A. Lewis
d/b/a B&H Vendors, B&G Enterprises, Ltd., Penn Triple S trading as
Penn Vending Company, Eagle Coin Machine, All Brands Vending Co.,
Inc., Belfiore Music & Cigarette Co., Class A Vending, Melo-Tone
Vending, Inc., T.D. Rowe Corp., and C.I.C. Corporation.  All parties
entered into a joint written stipulation that if the district court's order is
not reversed on appeal, the claims of the remaining plaintiffs will be
dismissed with prejudice.  The parties also stipulated that if the claims of
all the plaintiffs are dismissed with prejudice in their entirety, the
counterclaims of Philip Morris will be dismissed with prejudice.  The
district court accordingly made an express determination pursuant to
F.R.Civ.P. 54(b) that there was no just reason for delay in permitting an
appeal of its summary judgment order in this case.

have standing, (2) vendors did not prove that cigarette sales declined in response to the promotional programs, and (3) vendors did not prove that the vending machines were in competition with the convenience stores.

The district court granted summary judgment against eight vendors for lack of standing,[9] partial summary judgment against the remaining two vendors for lack of standing,[10] and in the alternative concluded that summary judgment would be proper against all ten plaintiff vendors for failure to show that they compete with the convenience stores.

## II. ANALYSIS

A. *Standard of Review*

The standard of review of a district court's grant of summary judgment is de novo. *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "We must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

---

[9]Those vendors were B&H Vendors, B&G Enterprises, Ltd., Eagle Coin Machine, All Brands Vending Co., Inc., Belfiore Music & Cigarette Co., Class A Vending, Melo-Tone Vending, Inc., and T.D. Rowe Corp.

[10]The two vendors were Penn Triple S trading as Penn Vending Company, and C.I.C. Corporation.

B. *Statutory Standing*[11]

1.

The district court in this case found that those vendors who purchased cigarettes through a wholesaler did not have statutory standing. The district court's conclusion is correct, but some additional steps are necessary to arrive at that conclusion. Relying upon our decision in *Barnosky Oils, Inc. v. Union Oil Co. of California*, 665 F.2d 74 (6th Cir. 1981), the district court reasoned that Philip Morris did not so completely control the prices by which wholesalers sold to vendors as to meet the requirements of the so-called "indirect purchaser" theory. The "indirect purchaser" theory considers a plaintiff who has purchased through a middleman to be a "purchaser" for Robinson-Patman purposes if the supplier "sets or controls" the resale prices paid by the plaintiff. *Barnosky Oils*, 665 F.2d at 84. On appeal, vendors argue that the Supreme Court's decision in *FTC v. Fred Meyer, Inc.*, 390 U.S. 341 (1968), requires the conclusion that a retailer buying through a wholesaler can state a Robinson-Patman claim without being a direct purchaser as long as the retailer competes with a favored retailer who is a purchaser from the supplier. Here, however, unlike in *Fred Meyer*, the allegedly favored retailers (the convenience stores) also buy through wholesalers. Vendors argue that the indirect purchaser theory, typically used to show that the disfavored retailer is a purchaser, may be used to establish that the *favored* retailer is a purchaser. If so, vendors argue, *Fred Meyer* establishes that the fact that they compete with the convenience stores is sufficient for the vendors to have standing, even though the plaintiff vendors buy through wholesalers.

In order to reconcile the holdings of *Fred Meyer* and our subsequent holding in *Barnosky Oils*, it is necessary to

---

[11]Judges Moore and Katz do not concur in this subsection.

distinguish between claims brought under section 2(a) and claims brought under sections 2(d) and (e). *Barnosky Oils* was a section 2(a) case, while *Fred Meyer* was a section 2(d) case. The parties appear to talk past each other on appeal, in part because they—like the district court—treat section 2(a) and sections 2(d) and (e) as if, for the purposes of this case, they should be analyzed the same way. It is easier, however, to reconcile the controlling case law by treating section 2(a) separately from sections 2(d) and (e). When separately considered, it becomes clear that the district court was correct in granting summary judgment against the plaintiff vendors who purchase through wholesalers.[12]

2.

Section 2(a) deals with price discrimination in the original sale to the purchaser, whereas sections 2(d) and (e) address the purchaser's subsequent resale of the product. Sections 2(d) and (e) prohibit discrimination in giving, or reimbursing for, promotional services to purchasers who buy for resale. *Rickles, Inc. v. Frances Denney Corp.*, 508 F. Supp. 4, 6 (D.C. Mass. 1980) ("'(A) seller's payments as well as services in connection with the original sale to the purchaser rather than with regard to the purchaser's subsequent resale were not cognizable under §§ 2(d) or 2(e) but were challengeable only under § 2(a) as indirect price discrimination.'" (quoting *Kirby v. P. R. Mallory & Co., Inc.*, 489 F.2d 904, 909 (7th Cir. 1973)) (alternation in original)). Economists might observe that the ultimate economic effect of the different types of discrimination (i.e., price discrimination and discrimination in providing services that increase resales) is the same, since in either case one purchaser for resale is getting an economic benefit from the

---

[12]My analysis does not require that plaintiffs' § 2(a) claims be analyzed as § 2(d) and (e) claims. Such a recategorization was not argued by the parties in this case.

supplier that another is not getting. But Congress saw fit to distinguish between the two, apparently on the basis of how indirect the benefit was. Unlike section 2(a), violations of sections 2(d) and 2(e) do not explicitly require an injury to competition.[13] In addition, with respect to sections 2(d) and 2(e) the defendant does not have the same defenses that a defendant has under section 2(a). Under section 2(a) a defendant has two defenses: cost justification and meeting competition. Under sections 2(d) and (e), the defendant only has the meeting competition defense. *Hovenkamp* ¶ 2322; *see also* Note, *The Distinction Between the Scope of Section 2(a) and Sections 2(d) and 2(e) of the Robinson-Patman Act*, 83 MICH. L. REV. 1584, 1585-86 (1985). Given that Congress distinguished between section 2(a) claims on the one hand, and section 2(d) and (e) claims on the other, roughly on the basis of the indirectness of the discrimination, it makes sense that holdings regarding the closeness of the competing purchasers to the suppliers be limited to the particular statutory context in which they arose, at least where that permits us to reconcile controlling precedents.

The Supreme Court's holding in *Fred Meyer* dealt with section 2(d), and therefore does not support plaintiff vendors' arguments regarding their claims under section 2(a). In *Fred Meyer*, Fred Meyer, a large retail supermarket, annually conducted a sale campaign by selling coupon booklets to customers for ten cents. The booklet contained coupons for products sold by Fred Meyer, some amounting to a one-third reduction in cost. *Id*. at 344-45. Each coupon related to a specific product and the suppliers of the products paid Fred

---

[13]In private suits, however, courts have required injury-in-fact and causation. *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 734 (9th Cir. 1987) (noting that a plaintiff must allege an "actual injury attributable to something the antitrust laws were designed to prevent" and that its "failing to receive a promotional allowance . . . adversely affected its ability to compete with favored competitors"); *Hovenkamp* ¶ 2363.

Meyer $350 for each page advertising the product in the booklet. Also, some suppliers would give Fred Meyer "price reductions on its purchases of featured items, by replacing at no cost a percentage of the goods sold by [Fred] Meyer during the campaign, or by redeeming coupons in cash at an agreed rate." *Id*. at 345. Fred Meyer's sale campaign was very successful, and the $350 paid by suppliers more than paid for the costs of publishing and distributing the booklets. *Id*. at 345 n.4. The promotional benefits provided by the suppliers to Fred Meyer were not bestowed upon other retailers that purchased from wholesalers. The Federal Trade Commission found that

> this promotional scheme . . . violated §§ 2(d) and 2(a) in the following respects: First, the $350 paid to Meyer by each of four suppliers participating in the campaigns represented promotional allowances paid in violation of § 2(d) because similar allowances were not made available on proportionally equal terms to competing customers. Second, the additional value given Meyer by these suppliers in the form of discounts, free replacements of goods sold and coupon redemptions amounted to price discrimination prohibited by § 2(a).

*Id.* at 345.

The Supreme Court, focusing its decision solely on § 2(d), found that the "discriminatory promotional allowances" given to Fred Meyer by two suppliers were covered under § 2(d). *Id.* at 348. Those allowances were given when two suppliers, Tri-Valley Packing Association and Idaho Canning Company, (1) replaced without charge every third can of product sold under a three-for-the-price-of-two coupon campaign and (2) paid Fred Meyer $350 for a page in the coupon book. *Id.* at 346. These allowances were not "made available to wholesalers who purchase from the supplier and resell to the direct-buying retailer's [Fred Meyer's] competitors." *Id*. at 347. The Court held that "[Fred] Meyer's retail competitors,

rather than the two wholesalers, were competing customers under the statute." *Id.* at 348.

The Supreme Court reached its holding by starting with the premise that "on the facts of this case, § 2(d) reaches only discrimination between customers competing for resales at the same functional level and, therefore, does not mandate proportional equality between [Fred] Meyer and the two wholesalers." *Id.* at 348-49. After reviewing the legislative history of § 2(d), the Court found that the promotional allowances were forms of indirect price discrimination because smaller retailers could not shift their advertising costs as the larger retailers could by inducing the suppliers to provide allowances. "Congress chose to deter such indirect price discrimination by prohibiting the granting of sales promotional allowances to one customer unless accorded on proportionally equal terms to all competing customers." *Id*. at 352.

The Court defined "customers" to include those "retailers who buy through wholesalers and compete with a direct buyer in the resale of the supplier's product." *Id.* at 354. The Court analyzed the meaning of "competition" as found in § 2(d) and concluded that Congress intended the term to cover competition "between buyers who competed in resales of the supplier's products." *Id.* at 356. Therefore, the Court concluded that "the most reasonable construction of § 2(d) is one which places on the supplier the responsibility for making promotional allowances available to those [retailers] who compete directly with the favored buyer." *Id*. at 357. In light of the Commission's argument that it would create a huge burden on manufacturers to have to bypass wholesalers and provide allowances to all of their retailers, the Court seemed to narrow its holding: "We hold only that, when a supplier gives allowances to a direct-buying retailer, he must also make them available on comparable terms to those who buy his products through wholesalers and compete with the direct buyer in resales." *Id*. at 358.

The Supreme Court in *Fred Meyer* carefully limited its decision to the section 2(d) context, and the Court has not subsequently extended it to the section 2(a) context.[14] It makes sense not to extend the *Fred Meyer* analysis to section 2(a), since the focus of 2(a) is the discrimination in the price to the purchasers, not a discrimination in helping purchasers sell to others.[15] Some courts have explicitly refused to extend the *Fred Meyer* analysis to section 2(a) cases, because to do

---

[14]It is true that in *Perkins v. Standard Oil Co. of California*, 395 U.S. 642 (1969), the Supreme Court, in dealing with an issue involving section 2(a), relied on *Fred Meyer* for the general proposition that the word "customer" in § 2(a) as well as § 2(d) should not be read to allow avoidance of the Act's purposes "by the simple expedient of adding an additional link to the distribution chain." 395 U.S. at 647-48. However, the issue in *Perkins* was the *extent of damages* where the supplier discriminated among direct purchasers, and the Supreme Court held that damages could include those suffered as a result of the favored purchaser passing on its savings down the line to third and fourth level purchasers. The holding, dealing as it did with the scope of relief, did not extend the *Fred Meyer* analysis to find a violation of section 2(a) in the first place on the basis of price discriminations against truly indirect purchasers who merely can be said to compete with favored direct purchasers.

[15]It is true that some cases state that "purchaser" in section 2(a) should be interpreted the same as "customer" in section 2(d). *American News Co. v. FTC*, 300 F.2d 104, 109 (2d Cir. 1962); *Brewer v. Uniroyal, Inc.*, 498 F.2d 973, 977 (6th Cir. 1974) (dictum). However, these cases did not hold that a *Fred Meyer* analysis should be extended to section 2(a) claims. *American News* held in effect that "customer" in section 2(d) should be interpreted at least as broadly as "purchaser" in section 2(a). For the reasons stated in the text, the reverse is not true, and *American News* did not reach that issue. See the Second Circuit's later opinion in *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1026 n. 8 (2d Cir. 1976) ("It is true that in some instances the word 'customer' in § 2(d) and the word 'purchaser' in § 2(a), are to be given the same meaning, *see, e.g., American News* . . ., but the Supreme Court limited its holding in *Fred Meyer, Inc.* . . . to § 2(d) cases"). This court's dictum in *Brewer* also dealt with a very distinct issue from the one resolved in *Fred Meyer*: whether a subsidiary could be considered a purchaser or customer under either provision of the Act.

so would arguably require vertical price maintenance in violation of the Sherman Antitrust Act. *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1026 & n.8 (2d Cir. 1976); *see also The Iams Co. v. Falduti*, 974 F.Supp. 1263, 1271-72 (E.D. Mo. 1997). *But see Diehl & Sons v. Truck Rent-a-Center*, 445 F.Supp. 282, 286-87 (E.D. N.Y. 1978) (distinguishing *FLM Collision Parts*); *Julius Nasso Concrete Corp. v. DIC Concrete Corp.*, 467 F.Supp. 1016, 1019-20 (holding *Fred Meyer* rationale applies equally to sections 2(a) and 2(d)).

Moreover, this court's decision in *Barnosky Oils* implicitly rejected the applicability of the *Fred Meyer* approach to section 2(a) claims. In *Barnosky Oils*, a supplier (Union) was alleged to have price discriminated in favor of direct purchasing dealers over dealers who purchased through wholesalers ("Union jobbers" such as Barnosky). This court rejected the Robinson-Patman § 2(a) claim because a party alleging price discrimination under Robinson-Patman "must prove that the same seller charged different prices to different purchasers." 665 F.2d at 83. Because the dealers who purchased through Barnosky did not purchase directly from Union, and Union did not control the sale between Barnosky and its purchasers, there was no § 2(a) violation by Union. If the *Fred Meyer* analysis had been applied, Barnosky would not have had to show that Union controlled the sale between Barnosky and its purchasers, but only that Barnosky's purchasers were in competition with the dealers who bought directly from Union. The absence of such an analysis in *Barnosky Oils* strongly suggests that the *Fred Meyer* analysis is not applicable to § 2(a) claims.

The vendors' § 2(a) claims should therefore be analyzed under *Barnosky Oils*. Under this court's holding in that case, vendors can only bring §2(a) claims if vendors can show that Philip Morris controlled the sale by wholesalers to the vendors. While vendors argue on appeal that Philip Morris controlled the prices charged by wholesalers to convenience

stores (an issue dealt with below), they make no such argument with respect to their own purchases from wholesalers, and the record does not support such control. In the present case, there is no evidence cited by either party or the district court that the convenience stores buy directly from Philip Morris. The indirect purchaser doctrine, recognized by many courts to permit § 2(a) claims to go forward where there is such control, accordingly does not apply in this case.[16] As we said in *Barnosky Oils*, "[t]he purpose of the indirect [purchaser] doctrine is to prevent a manufacturer from insulating itself from Robinson-Patman liability by using a 'dummy' wholesaler to make sales at terms actually controlled by the manufacturer." 665 F.2d at 84. Absent any indication in the record that Philip Morris "actually controlled" the terms of sale by wholesalers to vendors, *Barnosky Oils* requires us to affirm the district court's summary judgment regarding section 2(a) claims brought by vendors who purchase through wholesalers. *See also Pierce v. Commercial Warehouse*, 876 F.2d 86, 87 (11th Cir. 1989); *Hiram Walker, Inc. v. A & S Tropical, Inc.*, 407 F.2d 4, 7-8 (5th Cir. 1969).

---

[16]The doctrine has been explained by the Seventh Circuit:

> If a seller can control the terms upon which a buyer once removed may purchase the seller's product from the seller's immediate buyer, the buyer once removed is for all practical, economic purposes dealing directly with the seller. If the seller controls the sale, he is responsible for the discrimination in the sale price, if there is such discrimination. If the seller cannot in some manner control the sale between his immediate buyer and a buyer once removed, then he has no power by his own action to prevent an injury to competition.

*Purolator Products, Inc. v. FTC*, 352 F.2d 874, 883 (7th Cir. 1968).

3.

With respect to vendors' section 2(d) and (e) claims, on the other hand, the *Barnosky Oils* requirement (that plaintiffs either purchase directly from the supplier or have the terms of plaintiffs' purchase from wholesalers be controlled by the supplier) is arguably not applicable because of the Supreme Court's analysis in *Fred Meyer*.[17] *Fred Meyer* held that a supplier could violate § 2(d) by discriminating against indirect buyers as long as the indirect buyers were *competitors of its direct buyers*. To apply the *Fred Meyer* analysis in this case, however, would require us to extend the holding of that case to situations where there is alleged discrimination against indirect buying competitors of the supplier's *indirect* buyers. In *Fred Meyer*, the *favored* purchasers (buyers) were *direct* purchasers. As Philip Morris points out on appeal, vendors have cited no cases in which neither the favored nor the disfavored buyers were direct purchasers from the allegedly discriminating supplier. It can be assumed, as vendors argue, however, that if the favored buyer met the requirements of the indirect purchaser doctrine, the *Fred Meyer* analysis would permit a section 2(d) or (e) claim.[18] On this assumption, it is necessary for us to examine whether there was such control by Philip Morris of the sales by wholesalers *to the convenience stores*.

---

[17]*Fred Meyer* was an FTC enforcement action, as opposed to a private party case. Philip Morris argues that *Fred Meyer* thus did not address statutory standing to bring a private suit. Regardless, the Court did define "customer" and there is no reason why this definition could not also apply to a private party action under the Act.

[18]In other words, a supplier could not discriminate against the *competitor of a favored indirect purchaser* in the provision of services if the supplier so controlled the terms of the sale by the wholesaler to the favored indirect purchaser, that the favored indirect purchaser should be considered a favored *direct* purchaser.

Vendors argue that Philip Morris controls the resale of its products by convenience stores. According to vendors, Philip Morris does this by: 1) controlling the price of cigarettes by requiring stores that participate in the promotional programs to pass the discounts along to customers, 2) having its field representatives solicit stores to participate in the promotional programs, 3) other interactions between Philip Morris's field representatives and the convenience stores such as oversight of the programs, 4) reserving the right to cancel the program if a particular store does not comply with the contract, and 5) requiring the convenience stores to provide Philip Morris with reports of sales.

Darrell Moody, Territory Sales Manager at Philip Morris, testified that he provides the stores with a Retailer Understanding Form that the stores fill out. The form contains the store's name, the brands on sale, and "the amount for Philip Morris per each price off, the specific pieces of point of sale and the specific placement thereof." When the stores return the forms to Moody, he verifies the amount sold by the stores with the wholesaler invoices. The wholesaler invoices are attached to the form before it is sent to Philip Morris's office. There is a separate form for noncompliance with the promotional program contract. Moody testified that he visits the stores and may prepare a noncompliance form at the time he observes noncompliance. If a noncompliance form is filled out, it results in nonpayment by Philip Morris to the store for that month and could even lead to termination of the contract.

Craig Johnson, Senior Vice President of Sales at Philip Morris, testified that Philip Morris pays the convenience stores for promotional expenses and that the promotions are passed to the consumer. Roy Anise, Vice President for Market Information and Planning at Philip Morris, testified that some of the larger convenience stores provide Philip Morris with monthly reports, detailing the amount of sales of Philip Morris's products and the stores' overall sales.

It appears from this evidence that Philip Morris has some control over the resale of its products by the convenience stores. Such control is, however, not sufficient to bring this case within the *Fred Meyer* analysis. While Philip Morris may have required the amount of discounts, it did not set the underlying prices for sale by the wholesalers, nor could the wholesalers be considered "dummy" companies. It would therefore be too great an extension of *Fred Meyer* to find that the competitors (vendors) of indirect purchasers like convenience stores are competing "customers" or "purchasers" for purposes of sections 2(d) and (e). In *Fred Meyer* the Supreme Court reasoned that "customer" should be defined "to include retailers who purchase through wholesalers and compete with direct buyers in resales" because

a narrower reading of §2(d) would lead to the following anomalous result. On the one hand, *direct-buying retailers* like Meyer, who resell large quantities of their supplier's products and therefore find it feasible to undertake the traditional wholesaling functions for themselves, would be protected by the provision from the granting of discriminatory promotional allowances to their direct-buying competitors. On the other hand, smaller retailers whose only access to suppliers is through independent wholesalers would not be entitled to this protection. Such a result would be diametrically opposed to Congress' clearly stated intent to improve the competitive position of small retailers by eliminating what was regarded as an abusive form of discrimination. If we were to read "customer" as excluding retailers who buy through wholesalers and *compete with direct buyers*, we would frustrate the purpose of §2(d).

390 U.S. at 352 (emphasis added). This policy does not apply where the favored purchaser buys indirectly from a wholesaler on terms that are not controlled by the allegedly discriminating supplier. Such buyers are inherently not the

customers who "undertake the wholesaling function for themselves."

A determination that the *Fred Meyer* analysis should not be extended to competitors of truly indirect purchasers is supported, moreover, by a recognition that, unlike in *Fred Meyer*, the circumstances of this case do not reflect the underlying concern that motivated the passage of the Robinson-Patman Act in the first place.[19]  Fred Meyer *was* the large retailer who was taking advantage of smaller retailers who bought through wholesalers.  The instant case, in contrast, involves alleged discrimination among different classes of indirect purchasers, not discrimination in favor of large direct-buying chain stores against small local stores.  There is thus no reason to expand the *Fred Meyer* analysis in this case to permit statutory standing on behalf of competitors of indirect purchasers, at least where the supplier, Philip Morris in this case, does not control the sales of the wholesalers so extensively as to imply a circumvention of the policies of the Act.

---

[19]As the Supreme Court explained in *FTC v. Morton Salt Co.*, 334 U.S. 37 (1948):

> The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale, or by reason of the seller's good faith effort to meet a competitor's equally low price.

*Id.* at 43.

### 4.

The district court's dismissal of plaintiff vendors who are not themselves purchasers from Philip Morris should therefore be affirmed because (1) they do not themselves buy directly from Philip Morris and their own purchases from wholesalers are not controlled by Philip Morris, and (2) with respect to section 2(d) and (e) claims, they cannot be considered customers under a *Fred Meyer* analysis because, although they compete with allegedly favored purchasers, the favored purchasers are not direct buying purchasers sufficiently analogous to the large retail chains that Congress was concerned about in passing the Robinson-Patman Act.

The district court accepted that the remaining two vendors that purchase part of their inventory directly from Philip Morris do have standing under the Act, and this is not challenged on appeal.[20]  Therefore, it is still necessary to determine whether these vendors were in competition with the convenience stores.

### C. *Competition*

The district court granted summary judgment in the alternative due to vendors' failure to prove that their vending machines were in competition with the convenience stores.  Under sections 2(a), 2(d) and 2(e), the complaining party must be in competition with the favored party.[21]  FTC

---

[20]These two vendors are Penn Triple S trading as Penn Vending Company, and C.I.C. Corporation.

[21]In addition, vendors and convenience stores must operate at the "same functional level." *Abbott Labs. v. Portland Retail Druggists Ass'n*, 425 U.S. 1, 12 (1976) (quoting *FTC v. Sun Oil Co.*, 371 U.S. 505, 520 (1963) (internal quotation marks omitted)).  Neither party addresses this requirement, but we find that vendors and convenience stores do operate at the same functional level—resale of the products.

Guidelines, 16 C.F.R. § 240.2(a), (b);[22] *Hovenkamp* ¶2333a. 16 C.F.R. § 240.5 defines "competing customers" as "all businesses that compete in the resale of the seller's products of like grade and quality at the same functional level of distribution regardless of whether they purchase directly from the seller or through some intermediary." Despite Philip Morris's argument that vendors failed to present sufficient evidence of competition, we conclude that vendors did produce sufficient evidence to create a genuine issue of fact as to whether competition exists between the convenience stores and the vending machines.

Vendors argue that the district court erred by requiring them to provide a cross-price elasticity study to show competition.[23] A Robinson-Patman plaintiff does not have to present, however, a cross-elasticity study to show that competition exists between it and the favored purchaser. Although such a study would be helpful, competition can be shown in other ways, and in the present case, vendors presented evidence that created a genuine issue of material

---

[22]The FTC has published guidelines for compliance with sections 2(d) and 2(e). 16 C.F.R. § 240.1 et seq. Although, these guidelines do not have the force of law, *see* 16 C.F.R. § 240.1, they are helpful in applying the Act. The FTC is "charged with the day-to-day administration of the Act" and its rulings should be given deference. *Fred Meyer*, 390 U.S. at 355; *see also* 15 U.S.C. § 45 (FTC given power to prevent unfair competition).

[23]Cross-elasticity of demand "measures the sensitivity of purchase of one good to change in the price of *another good*." David N. Hyman, *Microeconomics* 144 (4th ed. 1997). Mr. Hyman writes that "[c]ross-elasticity of demand may be positive or negative. A positive cross-elasticity of demand implies that the two goods are substitutes. Whenever the price of one good changes, other things being equal, the demand for the other moves in the same direction." *Id*. The higher the value of cross-elasticities, the greater the substitutability of the products. *Id*. at 145. If the value is zero then the products are unrelated to one another, such as typewriters and ice cream. *Id*.

---

fact as to whether they were in competition with the convenience stores.

Vendors presented the testimony of Dr. Newbern and Professor Fanara. Dr. Newbern conducted a study of adult smokers ("Newbern study") and Professor Fanara analyzed that study. Dr. Newbern surveyed, in three cities, 315 adult smokers who patronize bars that have vending machines. The Newbern study showed that, of the factors that influence the purchase of cigarettes from convenience-type stores, easy access was the most given response at 40.2% overall. The second most favored reason was that the price is lower than vending machines, 26.4%. As for purchases from convenience stores, 90.7% said they had recently purchased from a convenience store. The next question asked, "Where was the location of the store in relation to this establishment?" Fifty-seven percent said that the convenience store was more than three blocks from the bar. Overall, 55.4% of participants were aware of price promotions for Philip Morris cigarettes, and 59.1% had at some point purchased cigarettes because of a special price or quantity promotion. More than half (50.5%) of the participants stated that price influenced where they purchased cigarettes. The price difference between vending machines and stores that would most influence the participants (44.4%) to buy from a store instead of a vending machine was between fifty cents and one dollar. Thirty-five percent said that they would be influenced by a difference of more than one dollar. Finally, the survey asked about vending machine use. Almost all participants (91.9%) had at some time purchased from a vending machine: 71.2% within the past six months, 10.9% between six months and a year, and 17.9% over a year ago.

Professor Fanara analyzed this data and also reviewed the testimony of several expert witnesses. He found:

Among the individuals surveyed 91.9% stated that they had purchased cigarettes from a vending machine, and

71.2% stated that they had purchased cigarettes from a vending machine within less than six months. The results of questions five, six, and seven in Table 4 of the survey taken in light of economic theory, provide substantial support for competition at the same functional level, or for the same consumer dollar.[24]

The district court held that "[t]he data collected by Dr. Newbern, which Professor Fanara relies on in formulating his opinion, does not reflect whether smokers switched from using vending machines to purchasing their cigarettes solely at convenience stores in response to the defendant's promotional programs."[25] J.A. 121. But vendors do not need to show that smokers switched from vending machines to convenience store purchases on the basis of the promotional programs. Such a requirement goes to injury, and the element at issue on this appeal is the existence, not the amount of damage to, competition. Nor must vendors show, as the district court appeared to require, "at what point an increase

---

[24]Those questions and responses were:

Question 5: Have you recently purchased cigarettes from a convenience store? Overall affirmative response: 90.7%.

Question 6: Where was the location of the store in relation to this establishment? Within one block: 23.9%; within three blocks: 18.7%; more than three blocks: 57.4%.

Question 7: At which store did you make your purchase? Gas station/Mini-Mart: 41.8%; 7-11 Convenience Store: 20.6%; drug store: 3.9%; tobacco store: 2.5%; grocery store: 11.3%; other: 19.9%.

[25]The district court reached this conclusion and then found that there was no factual basis for vendors' expert testimony, apparently referring to Dr. Fanara. The court did not appear to make a similar finding with respect to Dr. Newbern's study and, in fact, concluded that the motion to strike Dr. Newbern's testimony was moot.

in the price of [vending machine] cigarettes will compel patrons of an establishment to forego the convenience of purchasing cigarettes from a vending machine on site and cause them to leave this site in order to purchase their cigarettes elsewhere."

The Newbern study survey showed that smokers purchase cigarettes both from convenience stores and vending machines. Even the district court found that the survey results showed that "some people purchase cigarettes from both" convenience stores and vending machines. J.A. 121. Also, since price is a consideration, the inference may be drawn that if the price of vending machines goes beyond a certain point (for example a difference of 50 cents to over $1.00 would cause 79.4% to buy at a store rather than a machine), then vending machines will lose business to convenience stores selling for less.

In addition to the expert testimony, several vendors testified that they were forced to remove their vending machines due to lost sales after customers kept leaving the premises to buy cigarettes at nearby convenience stores.[26] Mike Savar, principal of Penn Vending Company, a remaining plaintiff, testified that he received numerous phone calls from location owners complaining about customers leaving to buy cigarettes elsewhere. At one location, he lost the account after receiving such a complaint.

---

[26]Philip Morris asserts that the district court may not rely on the hearsay statements related by vendors about customers leaving establishments to buy cigarettes elsewhere to prove causation. *See e.g.*, *Stelwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267 (district court improperly considered anecdotal testimony that customers did not deal with manufacturers because the evidence was admitted under Rule 803(3) but was used to prove the truth of the facts asserted). On remand, the district court may decide whether vendors' anecdotal testimony is admissible as a basis to show that vendors compete with convenience stores.

Assuming that vendors' testimony is admissible, this evidence in addition to the Newbern study presents a question of material fact on the issue of whether competition exists. As *Thurman Industries v. Pay 'N Pak Stores, Inc.* noted,

> For antitrust purposes, defining the product market involves identification of the field of competition: the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business. This definitional process is a factual inquiry for the jury; the court may not weigh evidence or judge witness credibility.

875 F.2d 1369, 1374 (9th Cir. 1989) (citations omitted). In contrast to the instant case, in *Godfrey v. Pulitzer Publishing Co.*, the Eighth Circuit held that summary judgment was proper because the disfavored dealers did nothing more than cite one instance of losing business to support the required showing of competition. Furthermore, the expert did "not provide[] any tangible evidence, numerical or anecdotal, to show that the branch dealers in fact compete[d]." 276 F.3d 405, 412 (8th Cir. 2002). The disfavored dealers' conclusory statements that competition existed was insufficient. *Id.* "In order to survive a motion for summary judgment, the non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Id.* (quoting *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994)). Here vendors presented more than a mere basis for speculation or conjecture.

Vendors also submitted, in response to an interrogatory, a list of machines by zip code that assertedly compete with convenience stores listed by Philip Morris for the same zip code areas.

In the present case, viewing vendors' proffers in combination, there was a sufficient showing to avoid

summary judgment that Philip Morris products sold in convenience stores competed with the same products sold in vending machines. We therefore reverse the grant of summary judgment as to the remaining plaintiffs.[27]

D. *Other arguments*

Philip Morris argues that we may affirm on the alternative ground that vendors have not shown causation of competitive injury. This is a different ground from that relied upon by the district court. Competition may exist, of course, even though there has been no injury to that competition. In view of the fact-intensive nature of the injury issue, we decline to resolve it for the first time on appeal. The issue is more properly considered by the district court upon remand.

Vendors also challenge on appeal the district court's denial on mootness grounds of a motion by vendors for production of documents. In view of our present holding, the district

---

[27]In addition to Philip Morris's motion for summary judgment, the district court also had before it Philip Morris's motion to strike the expert testimony of Dr. Newbern and Professor Fanara. Philip Morris argues that vendors' expert testimony did not meet the requirements of Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and their progeny. The district court found insufficient evidence to show competition without having to reach the question whether Professor Fanara and Dr. Newbern's testimony should have been stricken. On appeal, Philip Morris argues that this court may address this issue because it is an alternative ground for summary judgment.

Rule 702 provides that an expert may testify to his/her opinion if (1) it is based upon "sufficient facts or data," (2) it is "the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. A trial judge must determine whether the expert testimony is relevant and reliable. *Daubert*, 509 U.S. at 589. Given the gatekeeping function of the district court to determine the reliability and relevance of expert testimony, *Kumho Tire Co.*, 526 U.S. at 142-43, the district court should decide on remand whether to grant this motion.

court may consider a renewed motion to that effect on remand. We express no view on whether the motion should be granted.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge, majority in part and concurring in part. While I agree with Judge Rogers's reasoning in Part II.C. of his opinion, with respect to the question of whether the convenience stores ("stores") are genuinely in competition with the vending-machine vendors ("vendors"), I do not agree that any of the plaintiff-vendors lack statutory standing. I therefore disagree with Part II.B., and write separately to express my conclusion that all plaintiffs have standing to challenge what are best considered violations of § 2(d) and (e) of the Act.

Plaintiff-vendors in this case allege violations of the Robinson-Patman Act, 15 U.S.C. § 13(a), (d), and (e) ("Act"). The district court granted Philip Morris's motion for summary judgment partially on the basis that the majority of the plaintiffs did not have statutory standing, as they did not purchase directly from Philip Morris. I believe that this determination was in error, and I would therefore reverse the district court's judgment in its entirety.

I agree with Judge Rogers that it is best to consider separately standing under § 2(a), prohibiting discriminatory pricing, and under § 2(d) and (e), prohibiting discriminatory provision of or reimbursement for promotional services. Under either statutory provision, however, I believe plaintiffs have standing. I would therefore allow all of the plaintiffs to proceed on all of their claims.

## I. The Vendors' Claims are Best Analyzed as § 2(d) Claims

Section 2(a) of the Act makes price discrimination, or the contemporaneous sale of goods of like quality to two different purchasers for two different prices, illegal. In addition to "direct" price discrimination, courts have held that § 2(a) also extends to "indirect" price discrimination, where identical price structures are made disparate through, for example, the granting of rebates, the payment of shipping costs, or the provision of free goods. *See Corn Prods. Refining Co. v. FTC*, 324 U.S. 726, 732 (1945); *National Dairy Prods. Corp. v. FTC*, 412 F.2d 605, 608, 611-12 (7th Cir. 1969); *see also* 14 HERBERT HOVENKAMP, ANTITRUST LAW ¶ 2322 (1999). Subsections 2(d) and (e), prohibiting the payment of "anything of value" in consideration for services rendered or facilities furnished in the resale of goods or the provision of those services or facilities themselves, also cover the provision of free goods to a reseller. 15 U.S.C. § 13(d), (e); *see* HOVENKAMP, *supra*, ¶ 2322b. There is therefore some overlap between § 2(a) and § 2(d) and (e), where a supplier provides free goods or provides rebates or other payment for particular services. Here, three of Philip Morris's promotional programs are under attack as Robinson-Patman violations: its price promotions, where the stores sell cigarette packs at a discount and are refunded the amount of the discount by Philip Morris; its product promotions, where the stores sell a certain number of packs for the price of a lesser number of packs, and are provided the extra pack or packs by Philip Morris (through product rebates); and its incentive promotions, where gifts are supplied to the stores to give to the ultimate retail consumer.[1] The product and price

---

[1] In addition, plaintiff-vendors complain of additional promotional fees, racks, fixtures, and signage made available by Philip Morris to their store competitors. Plaintiffs' Brief at 31. To the extent these programs reflect a Robinson-Patman violation, they are violative of § 2(d) and (e)

promotions, which consist of payments from Philip Morris to the stores, either in the form of a product rebate or a price rebate, seem potential § 2(a) violations as well as potential § 2(d) and (e) violations. Because each of these programs aims at providing benefit to the retail consumer, and results only in increased sales volume for the stores, rather than greater profit on each individual sale through a decreased wholesale price, I believe these programs are each best considered as § 2(d) and (e) violations. Philip Morris provides the free goods to the stores with the requirement that they pass those goods *on to the ultimate retail customer*; Philip Morris does not provide the free goods directly *to the stores* to dispose of as they wish. Courts that find a § 2(a) violation in the provision of free goods do so where free goods are provided to a purchaser who is then free to sell each good at any price she wishes. There the provision of free goods makes the "actual price" paid by the retailer for each individual good lower. *See National Dairy Prods.*, 412 F.2d at 608. Here, however, the profit the convenience stores receive remains steady for each pack of cigarettes purchased, as the benefit of the product rebate from Philip Morris is always offset by the cigarettes given away. Philip Morris's decision to provide free goods does not result in an overall increase in the profit received on each individual purchased good. *See id.* I believe that the promotional programs are therefore best analyzed under § 2(d) and (e). *Cf. R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 2000-1 Trade Cas. (CCH) ¶ 72,799 (N.D. Ill. 1999) (discussing interaction of § 2(a) and (d) and (e) vis-à-vis provision of free goods).

---

as the provision of or payment for promotional and advertising programs.

## II.  Under the Rule of *Fred Meyer*, Plaintiffs are Philip Morris's "Customers" for the Purposes of § 2(d) and (e)

Judge Rogers argues that *FTC v. Fred Meyer, Inc.*, 390 U.S. 341 (1968), can be distinguished from the present case on the basis that the favored customers in this case, the stores, do not purchase directly from Philip Morris.  However, *Fred Meyer*'s holding that the word "customer" in § 2(d) encompassed customers who purchased through a wholesaler, as well as direct-buying customers, should be applied to every use of the word "customer" in § 2(d) and not merely the third use thereof.[2]  Section 2(d) states:

> Payment for services or facilities for processing or sale.  It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

In *Fred Meyer,* the Court held that § 2(d)'s reference to "customers competing" with the favored customer included

---

[2]While the product promotions offered by Philip Morris and the provision of free goods by Philip Morris may be violations of § 2(e) rather than § 2(d), the statutory sections have long been considered as a cohesive whole, and the meaning of "purchaser" in § 2(e) as coterminous with that of "customer" in § 2(d).  *Kirby v. P.R. Mallory & Co.,* 489 F.2d 904, 909 (7th Cir. 1973), *cert. denied*, 417 U.S. 911 (1974); *see* HOVENKAMP, *supra*, ¶ 2363b, at 241.

retailers who purchased a supplier's goods through a wholesaler where the favored customer (respondent Fred Meyer) purchased directly from the supplier.  In that case, respondent grocery store's suppliers paid Fred Meyer in cash or in kind to feature their products in an annual coupon book without offering the same promotions to Fred Meyer's competitors, retailers who purchased through a wholesaler. *Id.* at 344-45.  In broadly defining "customers competing," the Court emphasized a functional analysis of the Act's terms, reasoning that "the proscription of § 2(d) reaches the kind of discriminatory promotional allowances" at issue in the case, but concluding that "Meyer's retail competitors, rather than the two wholesalers, were competing customers under the statute."  *Id.* at 348.  The Court specifically rejected the "narrow definition of 'customer'" offered by Fred Meyer, "which becomes wholly untenable when viewed in light of the central purpose of § 2(d) and the economic realities with which its framers were concerned."  *Id.* at 349.

The usual presumption that "the same words used twice in the same act have the same meaning," 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46:06, at 193 (6th ed. 2000), operates with even greater force here, where the same word is used twice within the same sentence within the same subsection of the Act.  *See Gustafson v. Alloyd Co.,* 513 U.S. 561, 568 (1995).  Given the clear holding in *Fred Meyer* that the third use of the word "customer" in § 2(d) includes customers who purchase through a wholesaler, it would take an extremely strong showing of Congressional intent to defeat the conclusion that the first use of the word "customer" in the same sentence carries the same meaning. While the functional analysis used in *Fred Meyer* may not weigh as heavily in favor of plaintiff-vendors' claims here as it did in favor of the FTC's argument in that case, it provides nothing near the showing necessary to establish that the meaning of "customer" in § 2(d) is not uniform.

In *Fred Meyer*, the Supreme Court based its interpretation of the Robinson-Patman Act on the functional reasons behind passage of the Act. Specifically, the Court reasoned that Congress had intended to protect smaller businesses, who could not afford to purchase directly from suppliers, against the concessions larger chains would be able to force as a result of their greater market power and direct dealings with the supplier. *Fred Meyer,* 390 U.S. at 350-53. Here, of course, the favored purchasers (the convenience stores) are not large chain stores buying directly from the supplier, but stores purchasing instead through a wholesaler. This intermediary cannot serve to distinguish the factual situation from that in *Fred Meyer* where, as here, the allegedly discriminatory supplier (Philip Morris) and the favored purchasers (the convenience stores) have direct dealings that are the allegedly unlawful behavior. That is, the functional difference between a direct purchaser and one who purchases through a wholesaler is only important where the passage through an intermediary insulates the supplier from its retailers, such as in typical price discrimination claims where the wholesaler, not the supplier, sets the actual price for the retailer. Here, the complained-of behavior consists only of promotional services rendered by Philip Morris directly to the favored stores, without any involvement of the wholesaler. Each of these promotions involves sustained contact and exchange of goods, services, and cash between Philip Morris and the stores. While the wholesaler sets the price of cigarettes that the store purchases, discrimination in that wholesaler-set price is not at issue in this case; the price discount provided by the promotions is. Philip Morris sets the terms of each promotion, monitors compliance with that promotion, and provides the benefit of each promotion directly to the convenience stores. *See* Judge Rogers's op. at 5; Plaintiffs' Brief at 5-7; Defendant's Brief at 7-8.

Given the strong presumption in favor of unitary meaning of terms in the same statutory provision, and the Supreme Court's decision in *Fred Meyer*, where the complained-of

services are provided directly to the retailer by the supplier, I conclude that "customer" includes those favored customers (the convenience stores in this case) who purchase through a wholesaler, and accordingly conclude that all plaintiff-vendors have statutory standing to challenge these promotions as violations of § 2(d) and (e) of the Act.

### III. If Plaintiffs' Claims are Considered Under § 2(a), the Proper Application of the Indirect-Purchaser Doctrine Would Confer Statutory Standing on All Plaintiffs

Although the promotional programs at issue are best considered as alleged violations of § 2(d) and (e) for the reasons noted above, even if they are considered as alleged violations of § 2(a) of the Act, all vendors still have standing.

The meaning of "purchaser" in § 2(a) has been held to be the same as that of "customer" in § 2(d) and "purchaser" in § 2(e). *See American News Co. v. FTC*, 300 F.2d 104, 109 (2d Cir.), *cert. denied*, 371 U.S. 824 (1962). That same court, however, was doubtful when faced with the applicability of *Fred Meyer* to § 2(a), expressing concern over requiring vertical price maintenance that might run afoul of the Sherman Act. *See FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1026 & n.8 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097 (1977). At least one other court has rejected the application, choosing instead to apply the "indirect buyer" rule of § 2(a) that predated *Fred Meyer. See Iams Co. v. Falduti*, 974 F. Supp. 1263, 1271-72 (E.D. Mo. 1997). Other courts, however, have chosen to apply *Fred Meyer* to § 2(a). *See White Indus., Inc. v. Cessna Aircraft Co.,* 657 F. Supp. 687, 701-03 (W.D. Mo. 1986), *aff'd*, 845 F.2d 1497 (8th Cir.), *cert. denied*, 488 U.S. 856 (1988); *Julius Nasso Concrete Corp. v. DIC Concrete Corp.,* 467 F. Supp. 1016,

1019-20 (S.D.N.Y. 1979);[3] *see also Checker Motors Corp. v. Chrysler Corp.,* 283 F. Supp. 876, 887 (S.D.N.Y. 1968), *aff'd,* 405 F.3d 319 (2d Cir.), *cert. denied,* 394 U.S. 999 (1969) (treating *Fred Meyer* as a particular application of indirect-purchaser rule). Appellee Philip Morris argues and Judge Rogers accepts that this court's case *Barnosky Oils, Inc. v. Union Oil Co. of California,* 665 F.2d 74 (6th Cir. 1981), forecloses the application of *Fred Meyer* to § 2(a). *Barnosky* dealt with a price-discrimination claim by an independent jobber (Barnosky), who claimed that the supplier's (Union Oil) sales to its own branded retail outlets at a lower price than Barnosky could afford to charge to its retail customers violated § 2(a). *Id.* at 83. In rejecting that claim, this court relied exclusively on the indirect-purchaser doctrine and did not cite *Fred Meyer* in doing so. While I doubt that this serves to preclude our application of *Fred Meyer* to the potential § 2(a) violations in this case, and *Barnosky* is in any event distinguishable as the more typical case where the supplier exercises no control over the price or the discount offered to the purchaser through the wholesaler, I believe it is unnecessary to decide the question, because the

---

[3] *Julius Nasso* inexplicably fails to distinguish *FLM Collision Parts*; it is worth noting, however, that *FLM* dealt with price differentiation *intra*-purchaser — each customer of Ford was charged a different price based on the identity of the ultimate purchaser, and FLM attempted to use *Fred Meyer* to argue that Ford was required to equalize the price ultimately charged to competing wholesalers. *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1026-27 (2d Cir. 1976), *cert. denied,* 429 U.S. 1097 (1977). Ford sold its parts to its franchised dealers, charging them less when they resold the part to an independent auto repair shop than when they sold the part to an independent wholesaler such as FLM, effectively pricing FLM out of the wholesaling business. *Id.* at 1023-24. The key point for the *FLM* court was that Ford did not discriminate between different purchasers, but instead between its purchasers in one guise — that of retailer — and another — that of wholesaler. Ultimately, *FLM*'s rejection of *Fred Meyer*'s applicability to §2(a) seems very much confined to the facts of that case. *Id.* at 1026.

indirect-purchaser doctrine adopted in *Barnosky* properly applies in this case.

The indirect-purchaser doctrine was adopted primarily to stop suppliers from setting up dummy wholesalers to evade the Act; in its simplest terms, the doctrine applies when the supplier of a product so closely controls the terms of that product's resale through a wholesaler that the supplier can be said to be the actual seller to the purchaser. HOVENKAMP, *supra,* ¶ 2311b; *see Purolator Prods., Inc. v. FTC,* 352 F.2d 874, 883 (7th Cir. 1965), *cert. denied,* 389 U.S. 1045 (1968). In the usual § 2(a) claim, the complained-of price discrimination consists of prices set by the actual seller, whether a direct seller or a supplier in control of its wholesaler, that differ between one purchaser and another. The price and the discrimination constitute an integrated whole, and where retailers attempting to use the indirect-purchaser rule cannot establish that suppliers control the price set by the wholesaler, the suppliers are immune from discrimination claims. Plaintiffs attempting to assert themselves as indirect purchasers are usually the customers of a wholesaler, competing with direct-purchasing customers, and are hamstrung by their purchase from an intermediary that sets the price and therefore perpetuates the complained-of "discrimination."[4] Here, however, the complained-of price discrimination is *not* the price set by the wholesaler, but the *discount* set directly by Philip Morris. Inasmuch as the provision of free goods constitutes a violation of § 2(a) as

---

[4] *See, e.g., Barnosky Oils, Inc. v. Union Oil Co. of Cal.,* 665 F.2d 74 (6th Cir. 1981). In that case, Union was actually selling to Barnosky at a lower price than to Union's retail outlets; Barnosky's claim on behalf of its retail customers was that the price wasn't "lower enough" to allow its customers to compete. Courts have consistently rejected attempts to use Robinson-Patman to preserve a particular level in a distribution system into perpetuity, *see Conoco Inc. v. Inman Oil Co.,* 774 F.2d 895, 904 (8th Cir. 1985); *see also Barnosky,* 665 F.2d at 83-84; *FLM Collision Parts,* 543 F.2d at 1025-26.

indirect price discrimination, the provision of free goods to certain retailers by Philip Morris is the § 2(a) violation — *not* the price set by the wholesaler. Therefore, the extension of that discount to certain retailers (the stores) and not to others (the vendors), where Philip Morris controls entirely the terms of that discount, constitutes price discrimination under the Act.

## IV. Conclusion

Because I believe the district court erred in granting summary judgment to defendant with respect to the vendors who do not purchase directly from Philip Morris, I would reverse the judgment in its entirety and allow all plaintiffs to proceed on both Counts I and II.