RECOMMENDED FOR FULL-TEXT PUBLICATION
 Pursuant to Sixth Circuit I.O.P. 32.1(b)
 File Name: 14a0088p.06

 UNITED STATES COURT OF APPEALS
 FOR THE SIXTH CIRCUIT
 _________________

 X
 -
 CAITLIN SJÖSTRAND,
 -
 Plaintiff-Appellant,
 -
 v.
 -
 No. 13-3449

 ,
 THE OHIO STATE UNIVERSITY, >
 Defendant-Appellee. N

 Appeal from the United States District Court
 for the Southern District of Columbus.
 No. 2:11-cv-00462—Mark R. Abel, Magistrate Judge.
 Argued: November 19, 2013
 Decided and Filed: April 28, 2014
 Before: DAUGHTREY, KETHLEDGE, and DONALD, Circuit Judges.

 _________________

 COUNSEL
ARGUED: Laren E. Knoll, THE KNOLL LAW FIRM, Dublin, Ohio, for Appellant.
Mia Meucci Yaniko, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus,
Ohio, for Appellee. ON BRIEF: Laren E. Knoll, THE KNOLL LAW FIRM, Dublin,
Ohio, for Appellant. Mia Meucci Yaniko, OFFICE OF THE OHIO ATTORNEY
GENERAL, Columbus, Ohio, for Appellee.
 KETHLEDGE, J., delivered the opinion of the court, in which DONALD, J.,
joined, and DAUGHTREY, J., joined in part. DAUGHTREY, J. (pp. 9–19), delivered
a separate opinion concurring in part and dissenting in part.
 _________________

 OPINION
 _________________

 KETHLEDGE, Circuit Judge. Caitlin Sjöstrand graduated magna cum laude
from the Ohio State University (Newark campus) in only two and a half years. Then she
applied to Ohio State’s Ph.D program in School Psychology, where her grade-point
average (3.87) was tied for highest in the applicant pool and her GRE scores (a
No. 13-3449 Sjöstrand v. OSU Page 2

combined 1110) exceeded the school’s requirements. But Sjöstrand also suffers from
Crohn’s disease; and according to Sjöstrand, her interviews with two of the program’s
professors focused more on her ailment than they did on anything else. Eventually, of
the seven applicants interviewed by the school, the only applicant rejected was
Sjöstrand.

 Sjöstrand thereafter sued OSU under Title II of the Americans with Disabilities
Act, 42 U.S.C. § 12132 et. seq., and the Rehabilitation Act, 29 U.S.C. § 701 et seq.,
claiming that the school had rejected her application “by reason of” her disability. OSU
moved for summary judgment, which the district court granted on the ground that
Sjöstrand lacked evidence that would allow a jury to find the school had rejected her
because of her Crohn’s. We disagree and reverse.

 I.

 In connection with her application to OSU’s School Psychology program,
Sjöstrand was separately interviewed by two professors from the program: Professor
Laurice Joseph, the program’s head, and Kisha Radliff, an assistant professor in the
program. According to Sjöstrand—whose testimony at this stage of the case we take as
true—each interviewer spent about half the interview discussing Sjöstrand’s Crohn’s
disease with her.

 Sjöstrand thereafter received a letter from an OSU admissions officer, Nance
Hoza, informing Sjöstrand that her application had been rejected. The letter did not offer
any reason for the denial, so Sjöstrand called Hoza to ask what the reason was. Hoza
said she did not know, and referred Sjöstrand to another admissions officer, Tim
Graham. Sjöstrand called Graham and asked why she had been denied admission.
Although Graham likewise lacked personal knowledge about Sjöstrand’s application, he
pulled her file and said that the only information available was that she did “not fit the
program.”

 Sjöstrand then attempted to call Joseph, leaving her two voicemails. It took
Joseph two weeks to call Sjöstrand back, and when she did Joseph was vague and
No. 13-3449 Sjöstrand v. OSU Page 3

evasive. In particular, when Sjöstrand asked what she could do to be a better “fit” for
the program—which was the reason flagged by Graham for her rejection—Joseph had
little or nothing to say.

 But six days later, in an email to another professor, Donna Pastore, Joseph recited
five putative reasons why the program had rejected Sjöstrand. Pastore then prepared a
draft letter to Sjostrand that recited three of those reasons as the basis for her rejection.
Eventually the reasons were cut to one—that “[t]he committee felt your interests and
motivation were a better match for counseling rather than school psychology”—and the
letter was sent to Sjöstrand.

 Sjöstrand thereafter sued OSU under Title II of the ADA and the Rehabilitation
Act. After discovery, a magistrate judge granted OSU’s motion for summary judgment.
This appeal followed.

 II.

 We review the district court’s grant of summary judgment de novo, viewing the
evidence in the light most favorable to Sjöstrand. Lexicon, Inc. v. Safeco Ins. Co. of Am.,
Inc., 436 F.3d 662, 667 (6th Cir. 2006). Summary judgment is proper only when the
record shows that there is no genuine issue as to any material fact. Id. “An issue of fact
is ‘genuine’ if the evidence is such that a reasonable jury could return a verdict for the
non-moving party.” Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 451 (6th Cir. 2004).

 A.

 Sjöstrand argues that OSU discriminated against her when it denied her
application, in violation of Title II of the ADA. Title II provides: “[N]o qualified
individual with a disability shall, by reason of such disability, be excluded from
participation in or be denied the benefits of the services, programs, or activities of a
public entity, or be subjected to discrimination by any such entity.” 42 U.S.C. § 12132.
As a state university, OSU is a public entity. See Olmstead v. L.C. ex rel. Zimrig,
527 U.S. 581, 589 (1999).
No. 13-3449 Sjöstrand v. OSU Page 4

 In the typical Title II case, the plaintiff alleges she was denied reasonable
accommodations in violation of the Act. In this case, however, Sjöstrand alleges not that
she was denied reasonable accommodations, but that the school discriminated against
her—on the basis of her Crohn’s disease—when it rejected her application.
Discrimination claims normally arise under Title I of the ADA. See 42 U.S.C. § 12112
(“No covered entity shall discriminate against a qualified individual on the basis of
disability in regard to job application procedures”). Thus, Sjostrand’s claim looks more
like the typical Title I claim than it does a Title II claim; and perhaps for that reason, the
parties assume that the Title I burden-shifting regime for proving discrimination applies
here. We make the same assumption for purposes of this appeal.

 Under that burden-shifting regime, Sjöstrand must first establish a prima facie
case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).
If she does, OSU must then offer a legitimate, nondiscriminatory reason for its rejection
of her application. Id. If OSU does so—and its burden is merely one of production, not
persuasion—Sjöstrand must then present evidence allowing a jury to find that the
university’s explanation is a pretext for unlawful discrimination. Id. at 804.

 1.

 The district court held that Sjöstrand failed to present evidence establishing a
prima facie case of discrimination. To make out that case, Sjöstrand must present
evidence showing first, that she is disabled; second, that she was “otherwise qualified”
for the program; and third, that OSU rejected her application “by reason of” her
disability. See 42 U.S.C. § 12132; Kaltenberger v. Ohio Coll. of Podiatric Med.,
162 F.3d 432, 435 (6th Cir. 1998). OSU concedes that Sjöstrand has met the first two
requirements, but disputes the third.

 Sjöstrand cites three kinds of evidence as proof that OSU rejected her by reason
of her disability. The first concerns her interviews. One can fairly read the testimony
of OSU’s own witnesses—Joseph, Radliff, and the only other professor in OSU’s School
Psychology program, Antoinette Miranda—to mean that one of the reasons to interview
an applicant, if not the most important reason, is to discuss any concerns with the
No. 13-3449 Sjöstrand v. OSU Page 5

student’s application. Yet according to Sjöstrand’s testimony—which of course a jury
would be entitled to believe—neither of her interviewers even mentioned any of the
putative reasons why her application was rejected, and each interviewer instead devoted
about half the interview to a discussion of her Crohn’s disease. The resulting inference
is that the interviewers’ real concern—and thus the reason they rejected Sjöstrand’s
application—was her Crohn’s disease.

 Second, a rational juror might find that inference bolstered by Joseph’s behavior
after the fact: by her failure to return Sjöstrand’s call for two weeks, by Joseph’s vague
and evasive answers when she did finally call back, and by Joseph’s production of no
less than five putative reasons for Sjöstrand’s rejection in an email six days after the
call—an email that, given its disparity with Joseph’s notably vague phone conversation
with Sjöstrand herself, a jaded (but still reasonable) juror might regard as merely
papering the file. OSU responds that Joseph was vague on the call with Sjöstrand only
because Joseph did not have Sjöstrand’s file in front of her then; but many jurors might
regard that explanation as lame, given that Joseph took two weeks to return the
call—meaning she could pick her moment to make it—and that Joseph obviously did
have the file when she sent her email to Pastore six days later.

 Third, Sjöstrand presented undisputed evidence that her grade point average was
tied for the highest in the applicant pool; that her GRE scores easily met the program’s
minimum requirements; and that, more to the point, the program admitted another
applicant whose grade point average was lower than Sjöstrand’s, whose GRE score was
below the school’s putative minimum, and whose application included numerous rather
obvious typographical errors (e.g., “enrollement,” “Specilization,” “commnuty”)—but
who did not, unlike Sjöstrand, have Crohn’s disease. Sjöstrand’s evidence was enough
to establish her prima facie case.

 2.

 OSU contends, and the district court found, that OSU articulated a legitimate,
nondiscriminatory reason for the faculty’s decision to reject Sjöstrand’s application.
OSU’s obligation at this step “is merely a burden of production, not of persuasion, and
No. 13-3449 Sjöstrand v. OSU Page 6

it does not involve a credibility assessment.” Upshaw v. Ford Motor Co., 576 F.3d 576,
585 (6th Cir. 2009).

 OSU offered an overarching reason for its rejection of Sjöstrand’s
application—that she was a better fit for the counseling program—with five more
specific reasons in support. Those putative reasons all concerned Sjöstrand’s responses
on her written application. Specifically, the reasons were that (1) Sjöstrand identified
as her preferred mentor a professor from the School Counseling program, Darcy
Granello, rather than a professor from the School Psychology program, to which she had
applied; (2) Sjöstrand expressed an interest in counseling adults, whereas the School
Psychology program focuses on counseling children; (3) Sjöstrand failed to identify
anything specific about the program’s mission; (4) Sjöstrand had limited experience
working with children; and (5) Sjöstrand had limited research experience. Professor
Joseph, among others, testified about these reasons in her deposition. We agree with the
district court that these reasons are sufficient to meet OSU’s burden of production.

 That leaves the question whether Sjöstrand presented evidence that would allow
a jury to find that these reasons—and thus OSU’s overarching reason about Sjöstrand’s
fit with the program—were pretextual. See Russell v. Univ. of Toledo, 537 F.3d 596, 604
(6th Cir. 2008). And on this point we respectfully disagree with the magistrate judge.
All of the program’s putative reasons for its rejection of Sjöstrand’s application are
caught between the pincers of the testimony of OSU’s own witnesses and the testimony
of Sjöstrand herself. Specifically, as shown above, everyone in this case—and notably
OSU’s own witnesses, including Joseph—agrees that at least one purpose of
interviewing an applicant is to discuss the program’s concerns about her application.
And yet, on the record as it comes to us here, neither Joseph nor Radliff asked any
questions—not a single one—about any of the five putative reasons for Sjöstrand’s
rejection. That omission is important evidence that these putative reasons were actually
pretextual ones, and that the real reason for Sjöstrand’s rejection was the one that Joseph
and Radliff discussed at length in Sjöstrand’s interviews: her Crohn’s disease.
No. 13-3449 Sjöstrand v. OSU Page 7

 Sjöstrand also presented evidence specific to each of the five reasons. First, it
is certainly true, as OSU points out, that Sjöstrand identified Professor Granello as her
preferred mentor, and that Granello was a member of the Counseling program. But
another applicant—the same one whose GRE scores were much lower than Sjöstrand’s,
and whose application contained typographical errors—failed to identify a preferred
mentor at all, and yet was admitted. So a jury might be skeptical of this reason.

 Second, although it is technically true that Sjöstrand expressed an interest in
counseling adults, the inference that OSU asks us to draw from that fact—that
counseling adults, rather than children, was Sjöstrand’s primary area of professional
interest—is based upon a tortured reading of her application. Her relevant response
states in full: “After graduating with a degree in school psychology, I would like to
independently contract with various school districts as an itinerant school psychologist.
Additionally, I would like to offer pro bono counseling services to parents who have
disabled or troubled children.” An itinerant school psychologist, of course, works with
children—specifically, disabled or troubled children—rather than adults. Moreover,
Sjöstrand did not say she wanted to counsel adults simpliciter, but rather said she wants
to counsel a certain kind of adult—namely, parents of disabled or troubled children.
And Sjöstrand said she wants to do this counseling pro bono, which itself shows that it
would not be her primary area of practice. Thus, the natural reading of this
response—and indeed, many jurors might think, the only fair one—was that Sjöstrand’s
reference to counseling parents was entirely ancillary to counseling their children.

 OSU’s third reason—that Sjöstrand “did not mention anything specific to our
mission in particular”—faults Sjöstrand for failing to answer a question that the
program’s application never asked. None of the application’s 12 questions ask for
commentary about the program’s “mission in particular.” Moreover, to the extent that
the school’s mission is to work with troubled or disadvantaged students in urban
schools—and Joseph herself stumbled in seeking to define the school’s mission in her
deposition—Sjöstrand did discuss those issues in her response. That the application’s
No. 13-3449 Sjöstrand v. OSU Page 8

instructions told Sjöstrand to respond to the school’s 12 questions in three pages or less
might also explain, in some juror’s minds, why she did not say more.

 OSU itself characterizes the two remaining reasons—that Sjöstrand had limited
experience working with children, and limited research experience—as “minor,” which
itself undermines their importance as reasons for her rejection. And Professor Miranda
testified, contrary to her employer’s arguments now, that Sjöstrand’s experience with
children was “promising.”

 None of this is to say, of course, that a jury would necessarily find OSU’s reasons
for Sjöstrand’s rejection to be pretextual. But it is to say that Sjöstrand presented
evidence sufficient to create a genuine issue as to whether they were. The issue is one
for a jury to decide.

 B.

 Sjöstrand also claims that OSU violated the Rehabilitation Act when it rejected
her application. The Act provides that “[n]o otherwise qualified individual with a
disability . . . shall, solely by reason of his or her disability, be . . . subjected to
discrimination[.]” 29 U.S.C. § 794(a). To prevail, Sjöstrand must make the same case
as for her ADA claim, except she must show that she was denied admission “solely”
because of her disability rather than “by reason of” it. See Burns v. City of Columbus,
Dept. of Public Safety, Div. of Police, 91 F.3d 836, 841 (6th Cir. 1996). For the reasons
already stated, Sjöstrand’s case presents a jury question under either standard.

 * * *

 The district court’s judgment is reversed, and the case remanded for proceedings
consistent with this opinion.
No. 13-3449 Sjöstrand v. OSU Page 9

 __________________________________________________

 CONCURRING IN PART AND DISSENTING IN PART
 __________________________________________________

 MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and

dissenting in part. Plaintiff Caitlin Sjöstrand contends that Ohio State University

violated the Americans with Disabilities Act when the university denied her admission

to its doctoral program in school psychology, despite what she claimed were her superior

qualifications. She attributed the rejection of her application to knowledge by the faculty

members who interviewed her that she had been diagnosed with Crohn’s disease.

However, the record demonstrates beyond question that Sjöstrand’s allegations of

disability discrimination were premised wholly on factual inconsistencies, speculation,

and conjecture. As a result, I am convinced that there was no basis on which to dispute

the university’s legitimate reasons for denying Sjöstrand’s application and, further, that

no reasonable jury could return a verdict in her favor. Thus, although I concur with the

majority’s determination that Sjöstrand met the less-than-onerous burden of establishing

a prima facie case, I respectfully dissent from the conclusion that there is a genuine

dispute of fact concerning the nature of the university’s explanation for its decision.

 I.

 In applying the burden-shifting analysis of McDonnell Douglas Corp. v. Green,

411 U.S. 792 (1973), to Sjöstrand’s claims under the Americans with Disabilities Act

(ADA), 42 U.S.C. § 12132, and the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), the

majority first concludes that Sjöstrand adduced evidence sufficient to establish a prima

facie case of discrimination. In order to establish a prima facie case under the ADA,
No. 13-3449 Sjöstrand v. OSU Page 10

“plaintiffs must allege either that they are or are perceived to be handicapped . . ., that

they are otherwise qualified for the [position], and that they were discriminated against

on the basis of their disability.” Andrews v. Ohio, 104 F.3d 803, 807 (6th Cir. 1997).

Plaintiffs bringing a cause of action under the Rehabilitation Act, in addition to alleging

a disability and qualifications for the position, must also establish that they were denied

equal treatment “solely by reason of [their] disability,” 29 U.S.C. § 794(a) (emphasis

added), and that the party alleged to be discriminating against them received “Federal

financial assistance.” Id.

 Ohio State did not contest the fact that Sjöstrand had been diagnosed with

Crohn’s disease, that she had made an initial showing that she met the minimum

qualifications for admission to the program, and that Ohio State receives federal

financial assistance. Thus, the only disputed issue at the prima facie stage of the

litigation was whether Sjöstrand could point to a genuine dispute over whether she was

denied admission to the school-psychology program either “by reason of” her disability

(ADA claim) or “solely by reason of” that disability (Rehabilitation Act claim). It is

important to note, however, that “[t]he burden of establishing a prima facie case . . . is

not onerous.” Tex. Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Because the standard is so easily met, I am willing to concede that Sjöstrand made out

a prima facie case. Concomitantly, the majority concedes that Ohio State satisfied its

burden of articulating legitimate, nondiscriminatory reasons for its decision to reject her

application. Where we part ways is over the authenticity of those reasons—specifically,

the majority’s determination that Sjöstrand produced evidence sufficient to question
No. 13-3449 Sjöstrand v. OSU Page 11

whether the university’s rationales were anything more than pretext to cover a

discriminatory purpose.

 II.

 The majority correctly notes that, generally, when reviewing a district court’s

grant of summary judgment, we must assume the truth of the non-moving party’s

evidence and construe all inferences from that evidence in the light most favorable to

that non-moving party. See, e.g., Ciminillo v. Streicher, 434 F.3d 461, 464 (6th Cir.

2006). “[S]ummary judgment will not lie if the dispute about a material fact is

‘genuine,’ that is, if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). “In

order to survive a motion for summary judgment, the non-moving party must be able to

show sufficient probative evidence [that] would permit a finding in [her] favor on more

than mere speculation, conjecture, or fantasy.” Lewis v. Philip Morris, Inc., 355 F.3d

515, 533 (6th Cir. 2004) (internal quotation marks and citation omitted). Unfortunately

for Sjöstrand, a thoughtful examination of the evidence upon which the majority relies

to establish a genuine dispute regarding Ohio State’s alleged discriminatory animus

reveals that Sjöstrand’s case is based solely upon the type of speculation and conjecture

that we are not at liberty to consider as support for a reasonable jury determination.

 III.

 For instance, the majority insists that we may infer that the true concern of

Sjöstrand’s interviewers was actually the plaintiff’s Crohn’s disease from the fact that

they did not question Sjöstrand about her identification of an inappropriate mentor, but

“instead devoted about half the interview to a discussion of her [disability].” It is true
No. 13-3449 Sjöstrand v. OSU Page 12

that Sjöstrand testified in her deposition that “seven to ten minutes” of her 20-minute

interview with Dr. Radliff, and “seven to ten minutes” of her 20-minute interview with

Dr. Joseph were spent discussing Question 10 on the school’s application: “How do you

respond to stress and novel situations?” Further deposition testimony established,

however, that this allegation by the plaintiff was blatantly false, as shown by the

following colloquy with Sjöstrand:

 Q. Let’s talk about question 10. What did [Professor Radliff] ask you
 about that question?
 A. She specified that I had mentioned Crohn’s earlier in the interview
 and within my written application. And she asked if that would be a
 problem regarding my education in the school psychology program, how
 I would handle the stress of graduate school. (Emphasis added.)

 Q. Do you recall how you responded?

 A. In a response similar to that which I had written.1 I indicated that I
 had learned how to manage my stress from Crohn’s and that I had not
 had a Crohn’s episode since high school.

 Q. What, if anything, did Professor Radliff say or ask you about your
 response to the question?

 A. She nodded in affirmation.

 Q. Was there any further discussion about question 10 with Professor
 Radliff?

 A. Not that I recall at this time.

 *****

 Q. What did Dr. Joseph ask you about question 10?

 A. She framed it in the context of Crohn’s.
1
 Sjöstrand’s entire written response to question 10 on her application is as follows:
 Over the years, I have learned that intense stress can trigger a Crohn’s episode. This realization
 has required that I develop various coping mechanisms. I have taken up several hobbies and have
 learned to entertain myself with various activities. By nature, I am an easygoing person and am
 able to “go with the flow” very easily; learning how to manage my disease effectively has simply
 made me more so.
No. 13-3449 Sjöstrand v. OSU Page 13

 Q. Can you explain what you mean?

 A. She mentioned that I had mentioned Crohn’s, and was I concerned
 that school psychology or the program at OSU would be too stressful,
 would the stress of the program and graduate school in general, cause a
 flare-up, or a Crohn’s episode, and how did I manage – or how was I
 planning to manage the stress of graduate school. (Emphasis added.)

 Q. How did you respond?

 A. In a manner similar to that which I said in Dr. Radliff’s interview,
 that I have not had a Crohn’s episode since high school. I have learned
 to manage my stress through my previous experiences with Crohn’s, and
 I did not anticipate it being a problem.

 Q. What, if anything, did Dr. Joseph say to you or ask you about your
 response?

 A. She didn’t.

 It is incomprehensible that the two questions and the two answers recounted by

Sjöstrand accounted for 14-20 minutes of the total 40-minute interview time. Such

contradictory statements in the evidence put forth by the plaintiff justify the conclusion

that Sjöstrand failed to create a genuine dispute of fact in this case. As we stated in

Bonds v. Cox, 20 F.3d 697, 703 (6th Cir. 1994):

 It is indeed difficult, under these circumstances, to determine how to
 consider the evidence in the light most favorable to [the non-moving
 party] when her own allegations regarding the crucial issues of fact are
 in direct conflict. We do not believe that the standard of review for
 summary judgment . . . requires us to ignore a party’s own conflicting
 statements in construing the facts to her best advantage.

 Nor can we view as anything more than mere conjecture the conclusion that

Radliff’s and Joseph’s failure to ask Sjöstrand about her inappropriate selection of Dr.

Granello as a faculty advisor meant that the professors based their decision to reject

Sjöstrand’s application on the existence of her Crohn’s disease. Instead, given her
No. 13-3449 Sjöstrand v. OSU Page 14

application and her choice of Granello, faculty members were legitimately concerned

that Sjöstrand’s interest lay in school counseling, which was not part of Ohio State’s

graduate program in school psychology. In order to better calculate Sjöstrand’s fit with

their program, Radliff’s and Joseph’s questioning was calculated to tease out the

applicant’s real career interests and not allow her to tailor her answers to what she

thought the interviewers wanted to hear from her. Thus, when questioned about why she

did not ask Sjöstrand about her choice of a faculty mentor who was not in the school-

psychology department, Radliff responded:

 I feel like I would be more likely to – to [say], “Now, you’ve been here,
 you’ve seen who the faculty are” and just curious if she’s going to talk
 about working with one of us, what our research interests are and so forth
 . . . . I guess I would see it as kind of — maybe a potentially
 embarrassing issue. Wouldn’t want to come across as trying to
 embarrass her for indicating an incorrect faculty member.

 Similarly, Joseph testified that she did not ask Sjöstrand a direct question about

her stated interest in school counseling—as opposed to school psychology—or about

why she chose Dr. Granello as a mentor but, instead, tried to broach both subjects from

a different prospective. Joseph explained:

 We don’t want to lead the applicant into making responses that – that
 they think we want to hear. We really try to assess, ascertain whether or
 not this applicant is a right fit for what we have to offer in our program.
 So, you know, I mean – I mean, we really try to kind of leave it open for
 them to talk about so that we can better – best assess whether or not – We
 don’t want to lead them in any way toward an answer or toward a
 response because we really want – we want it to be a natural – you know,
 as natural as it can be fit with – with what we have to offer.

 *****
 When I asked her questions about what her research interests are, we
 were looking for an opportunity for her to indicate any one of our areas
 of interest. So we left it open to her to indicate, because like I said, we
 don’t like to lead the applicant into – You know, like if she would have
 said Dr. Granello and then followed up and said specific – some specific
No. 13-3449 Sjöstrand v. OSU Page 15

 things about, you know, what we have to offer and – with regards to our
 research areas, that would be different.

 Furthermore, all the evidence before us, including Sjöstrand’s own deposition

testimony, establishes without question that it was Sjöstrand herself, and not the

interviewers, who introduced conversation about her Crohn’s disease into the interview

process. In addition, Dr. Antoinette Miranda, the third member of the school-

psychology faculty, testified without contradiction that Sjöstrand’s disability was never

brought up or considered during the faculty’s admissions deliberations. In fact, Miranda

also said that the three faculty members “were really surprised that [Sjöstrand’s Crohn’s

disease] was the reason she was saying she was being denied because for us that was not

an issue” in making the decision, it “was not an issue that came up,” and the three

professors “didn’t even talk about it.” In light of the uncontroverted record before us,

for the majority now to assert that there is some genuine factual dispute over whether

Sjöstrand’s disability factored into the school’s decision is pure speculation, bordering

on the fantastical. Indeed, given the fact that Sjöstrand received her undergraduate

degree from Ohio State, with honors, in only two-and-one-half years, Joseph, Radliff,

and Miranda were clearly on notice that the plaintiff’s Crohn’s disease had not

hampered, and presumably would not hamper, her academic efforts. Instead, they (and

the university) relied upon legitimate, articulated reasons to deny Sjöstrand admission

to the graduate program.

 The majority lists those reasons and then proceeds to pick apart the rationales,

all the while failing to recognize that it is only pure conjecture that would allow a

reasonable jury to conclude that invidious discrimination, rather than the proffered

logical explanations, precipitated the admissions decision. As it must, the majority
No. 13-3449 Sjöstrand v. OSU Page 16

concedes that Sjöstrand identified as an advisor a faculty member in a different

department whose research interests did not coincide with the focus of the school-

psychology program. But, instead of recognizing the legitimacy of the desire by a very

small faculty to train students whose own research and career interests aligned with

theirs, the majority suggests that their focus on Sjöstrand’s choice of Granello as an

advisor must have been an attempt to cover up a discriminatory intent. Rather than

pointing to any actual facts in support of that idea, however, the majority simply notes

that another applicant who was accepted into the program identified no mentor at all in

her application. But choosing not to name a particular faculty member with whom to

collaborate on projects within the scope of the program’s mission is very different from

identifying an unavailable faculty advisor from outside the relevant academic

department. It borders on the preposterous to conclude that the university’s rationale in

this regard was somehow an effort to mask an intent to treat Sjöstrand differently “by

reason of” or “solely by reason of” a supposed disability that had not actually manifested

itself for some three years.

 The majority also holds that disputes of fact regarding the discriminatory animus

of the university were manifested by its listing of the following conceded facts as

additional reasons for denying Sjöstrand admission to the graduate program: (1) the

plaintiff’s wish to serve as an itinerant psychologist who would spend a portion of her

time offering counseling services to adults; (2) the failure of Sjöstrand’s application to

reflect an understanding of the unique niche that the Ohio State graduate program in

school psychology filled and, importantly, that was seemingly at odds with Sjöstrand’s

career goals; (3) the plaintiff’s limited experience working with children, the very focus
No. 13-3449 Sjöstrand v. OSU Page 17

of the school-psychology program; and (4) Sjöstrand’s relative lack of research activity,

even though the program leaders felt that “prior research experiences are important at

the doctoral level.” Again, however, only by engaging in mere speculation and

conjecture can the majority attribute invalid motives to such decision-making.

 As has been made abundantly clear by the appellate record, Ohio State’s doctoral

program in school psychology was a small one, served by only three faculty members.

As such, the program had limited spaces available for students if the three professors

were to fulfill their essential function of instructing graduate students and directing their

research projects. Consequently, those in charge of the doctoral program, which had as

its mission a focus on issues affecting diverse, urban school districts, sought to admit

individuals drawn to that mission. As Dr. Radliff explained:

 [T]he OSU School Psychology program is a specialized program,
 specializing in urban education. We have a social justice emphasis, and
 so some of the questions here are to get at what is a student’s interest in
 coming to OSU in particular. And we’re looking to see are they
 interested in our mission, because our program may be a little bit
 different and have different foci than other School Psychology programs,
 and then also just a general interest in their working and – experiences
 and working with children, adolescents and then in particular their
 experiences working with diverse youth, urban education or working in
 an urban setting types of things, so have they had some experiences that
 would relate to the types of experiences that they will be getting in the
 program . . . .

 Despite her lack of background in dealing with children or with inner-city

schools, Sjöstrand was invited to interview with department officials in large part due

to the stellar academic record she compiled as an undergraduate. Through her written

application answers and through her responses to interview questions, however,

Sjöstrand failed to express an awareness of or an appreciation for the unique role the

school viewed itself as filling. To the contrary, the plaintiff admitted in her deposition
No. 13-3449 Sjöstrand v. OSU Page 18

that she applied to the Ohio State program only because “[i]t was the closest school in

proximity to my home and my family and my church.” The university’s consideration

of the disconnect between the school’s mission and Sjöstrand’s goals, its consideration

of the incompatibility of Sjöstrand’s research interests with those of her potential faculty

advisors, and its consideration of the plaintiff’s lack of experience in the very matters

the program emphasized all justified the decision not to admit Sjöstrand to the doctoral

program. The plaintiff and the majority can point to no facts or evidence that would

allow a reasonable jury to conclude otherwise, at least not in the absence of speculation

or conjecture.

 IV.

 Despite our claims to national enlightenment and exceptionalism, there is no

doubt that our country still tolerates the existence of discrimination in its many forms.

One need only open a newspaper, watch television “news,” or log on to any of

innumerable websites to be bombarded with examples of race-based, gender-based,

ethnicity-based, religion-based, or disability-based discrimination. In an effort to

eradicate the effects of such malice, federal statutes like the ADA and the Rehabilitation

Act stand as bulwarks against the ignorance and mean-spiritedness that spawn such

destructive attitudes. That being said, however, the setback that Caitlin Sjöstrand

experienced when she applied to Ohio State University’s doctoral program in school

psychology cannot be attributed to invidious discrimination. The majority concludes

that “Sjöstrand presented evidence creating a genuine issue as to whether” the school’s

reasons for rejecting the plaintiff’s application for admission were pretextual. Although

I agree that Sjöstrand satisfied her less-than-onerous burden of establishing a prima facie
No. 13-3449 Sjöstrand v. OSU Page 19

case of disability discrimination, only rank speculation and conjecture would allow a

reasonable jury to find that Ohio State harbored discriminatory animus toward Sjöstrand

based upon the fact that she had been diagnosed with Crohn’s disease. I therefore

respectfully dissent from the majority’s determination that the judgment of the district

court should be reversed.