NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0823n.06

Case No. 13-2652

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Oct 30, 2014
DEBORAH S. HUNT, Clerk

THOMPSON I.G., LLC,                              )
                                                 )
     Plaintiff-Appellant,                        )
                                                 )
                                                 )   ON APPEAL FROM THE
v.                                               )   UNITED STATES DISTRICT
                                                 )   COURT FOR THE EASTERN
EDGETECH I.G. INC.,                              )   DISTRICT OF MICHIGAN
                                                 )
     Defendant-Appellee.                         )
                                                 )
_____/            )

Before:  KEITH, MOORE, and STRANCH, Circuit Judges

     DAMON J. KEITH, Circuit Judge.

     This case presents a commercial dispute arising from a contract for the sale of window parts. Plaintiff-Appellant Thompson I.G., LLC ("Thompson") is a Michigan company that manufactures windows. Thompson bought foam "spacers" from Defendant-Appellee Edgetech I.G., Inc. ("Edgetech"), an Ohio corporation, for use in its windows. Thompson sued Edgetech based on allegations that the spacers were defective, asserting claims for breach of contract, breach of express warranty, breach of implied warranty, and fraud. The district court dismissed Thompson's breach of implied warranty claim and granted summary judgment on the others. Thompson appeals from the district court's final judgment. For the reasons that follow, we **AFFIRM** the judgment of the district court.

- 1 -

## I.  BACKGROUND

Thompson manufactures insulated glass ("IG") units. IG units are large window parts consisting of two panes of insulated glass. Edgetech manufactures smaller window parts called spacers. Apparently, in 2003, Edgetech marketed a spacer called Super Spacer to Thompson. Super Spacer maintains the glass panes in IG units at the desired air space, thus promoting insulation. In contrast to traditional aluminum spacers, Super Spacer is made of foam. Although Edgetech manufactures more than one type of Super Spacer, this case concerns the Super Spacer whose foam contains ethylene propylene diene monomer ("EPDM"). Unless otherwise noted, "Super Spacer" refers to the EPDM-type Super Spacer.

In January 2005, Thompson and Edgetech held a meeting at Edgetech's Ohio facility. There, Edgetech employee Larry Johnson made a PowerPoint presentation. Thompson's former president, Russell Manser, states that Johnson made a misrepresentation during the presentation. Manser asserts that Johnson falsely stated that Super Spacer had passed testing standards of the American Society for Testing and Materials. R. at 1767.[1] Likewise, Thompson asserts that the presentation's slides show that Edgetech represented that Super Spacer had passed various tests from other standards organizations. R. at 2083, 2093. But Gerhard Reichert, a former senior-level Edgetech employee and coinventor of Super Spacer, states that Super Spacer had failed some of these tests and that Edgetech knew so. R. at 2050–51. Reichert also states that, from 2004 to 2011, numerous Edgetech customers complained that Super Spacer had failed the

---

[1] "R." designates citations to the paginated record of the proceedings below. Thus, "R. at 1767" refers to PageID 1767, "R. at 2083" refers to PageID 2083, and so on.

"fogging test," which means that the window assemblies using the Super Spacer fogged up during testing. R. at 2480.[2]

Manser adds that, during the same meeting, Johnson and another Edgetech representative recommended that Thompson use Fenzi polysulfide ("polysulfide") as a secondary sealant. According to Thompson, one must use a secondary sealant with EPDM because EPDM outgasses at or above 60°C and the secondary sealant prevents the outgassing.[3][4] Manser further asserts that the Edgetech representatives discussed using hot melt butyl or polyurethane as a secondary sealant instead of polysulfide. The Edgetech representatives did not recommend hot melt butyl. They knew that Thompson planned to install some of the IG units in RVs and concluded that hot melt butyl would melt under the intense heat that the exposed RV windows would experience. Manser does not explain why polyurethane was not selected. R. at 2495. For his part, Reichert states that he knew that "EPDM was not designed for polysulfide" and that this combination had failed industry standards in several countries. R. at 2479. Reichert adds that he advised "countless" Edgetech customers over the years to use silicone spacers, not EPDM spacers, with polysulfide. R. at 2482. Likewise, other Thompson witnesses suggested that EPDM was incompatible with polysulfide. *See, e.g.*, R. at 2487–88, 2499–2500.

In February 2005, the Parties entered into a Usage Purchase Agreement ("Contract"). R. at 1815. Thereby, Thompson agreed to purchase a minimum of sixty million linear feet of Super Spacer over approximately five years. R. at 1815–16. The Contract incorporated the terms of a

---

[2] The parties dispute the cause of the windows' fogging. Thompson argues that the windows fogged because Edgetech's Super Spacers were "outgassing," meaning that they released gas that was trapped between the two window panes in the assembly. Edgetech argues that the windows fogged because Thompson assembled them poorly, which allowed moisture from outside to enter.

[3] Although Thompson states on brief that EPDM and Super Spacer would outgas at 50°C, Thompson's expert testified that these products outgassed at or above 60°C. R. at 2462. Whether these products outgassed at 50°C or 60°C is ultimately immaterial.

[4] The distinction between a primary sealant and a secondary sealant is irrelevant to the analysis.

document titled Terms and Conditions of Sale ("Terms"). R. at 1814. Paragraph 4 of the Terms is titled "Limited Warranty." Under paragraph 4, Edgetech expressly guaranteed that the Super Spacer would be "free of manufacturing defects at the time of shipping from Edgetech." R. at 1814. For its part, paragraph 19 states that the Contract "shall be governed by the laws of the State of Ohio." R. at 1814.

According to Thompson engineer Ed Wilson, Thompson started receiving defective IG units in February/March 2011.[5] R. at 1458. Around that time, Wilson instructed Thompson employees to preserve the returned IG units. R. at 1458. On or around March 31, 2011, Thompson filed suit against Edgetech in Michigan state court. On June 30, 2011, Edgetech removed the case on the basis of diversity jurisdiction. Thompson filed an amended complaint on August 29, 2011. The amended complaint asserted claims for breach of contract, breach of implied warranty, breach of express warranty, and fraud. For reasons irrelevant here, the district court granted a motion to dismiss the implied warranty claim.

Edgetech moved to disqualify Reichert and Stephen H. Howes as Thompson's experts. The district court granted the motion to disqualify Reichert. Noting that Reichert had been a "longstanding, high-ranking employee of Edgetech," the district court reasoned that "[a]llowing Reichert to serve as an expert is analogous to an expert switching sides mid-litigation." R. at 549. Yet the district court did not conclude that Reichert could not testify as a fact witness and Edgetech has not so argued. For his part, Howes was not disqualified. Thompson tendered Howes to testify that Super Spacer was incompatible with polysulfide and that this incompatibility caused the windows in question to outgas. Howes intended to base his testimony on testing he conducted "when trying to create a competitive product . . . ." R. at 2414.

---

[5] It is unclear whether Thompson alleges to have received defective IG units before this date.

Thompson also proffered Howes's opinion that five returned windows were defective because their Super Spacers outgassed.[6] Edgetech urged the district court to disqualify Howes because (1) he failed to save any data or material from his tests supposedly showing that Super Spacer was incompatible with polysulfide; and (2) he only visually examined the five returned windows and failed to break them open and examine the actual fog. Although the district court noted that the scientific basis of Howes's opinion was "attenuated" and "[might] not withstand scrutiny on cross-examination," it declined to disqualify him. R. at 2416. The Parties do not contest the district court's disposition of the motions to disqualify.

Edgetech also moved for sanctions, alleging that Thompson spoliated evidence and committed fraud on the district court. Edgetech argued that Thompson failed to preserve the defective windows and obstructed the efforts of its expert, William Lingell, to inspect the five windows that Howes visually examined. Thompson itemized the defective windows in a "Warranty Report" purporting to show that its customers returned 277 windows due to defective Super Spacer. Manser stated that the warranty report constituted Thompson's "best guess" of all the Super Spacer failures. R. at 1739. Manser acknowledged that the warranty report does not show whether the windows had Super Spacers or metal (i.e., aluminum) spacers. R. at 1739–40. Likewise, two Thompson customers stated that some of the claims in the report were for metal spacers. R. at 1848–58, 1860. Another Thompson customer stated that it never submitted certain claims in the report. R. at 1861. At any rate, it is undisputed that Thompson failed to produce these windows. Thompson blamed this failure on the difficulty of removing the windows without

---

[6] Howes originally stated that he examined six windows and later changed this number to five. Although Thompson was supposed to make these windows available to Edgetech for inspection, some evidence suggests that Thompson made only four windows available. But whether Howes examined four or five windows is immaterial to the issues at hand. Consistent with Howes's latest declaration, we assume that he inspected five.

breaking their glass and at least two customers' destruction of the units and/or failure to return them. R. at 1398, 1402–03, 1408. Yet Manser stated that Thompson received defective IG units in the 2004–2011 period and estimated that it discarded 375 such units at its Michigan facility. R. at 1183. Although Manser later stated that the 375 estimate was "way off," he did not disavow his earlier statement that Thompson discarded some IG units. Paul Lewis, a Thompson sales representative, also stated that Thompson discarded returned IG units. R. at 1431. Thompson downplays the extent to which the discarded IG units contained Super Spacer. Thompson also asserts that it notified its employees as early as May 2011 that the Super Spacer units needed to be preserved. R. at 1492, 1494. But other evidence indicates that Thompson failed to notify some of its employees to preserve the Super Spacer units and failed to institute a procedure to prevent their disposal until some time between January and March 2013. R. at 1157, 1183, 1205. Nonetheless, the district court denied Edgetech's motion for sanctions. In reaching this conclusion, the district court reasoned that (1) Thompson sought to safeguard the windows early in the case; and (2) Thompson's alleged spoliation did not preclude Lingell from forming his opinion that poor workmanship by Thompson caused the failures.

Edgetech moved for summary judgment. Among other things, Edgetech argued that: (1) Thompson could not demonstrate breach or causation on its breach of contract and breach of express warranty claims; and (2) Michigan's economic loss doctrine barred Thompson's fraud claim. On November 14, 2013, the district court entered an opinion and order granting Edgetech's summary judgment motion and dismissing the case. *See* R. at 2603. The district court held that Thompson submitted insufficient evidence to show that the Super Spacers outgassed or that any outgassing caused the damages detailed in the warranty report. R. at 2611–12. The district court also held that Thompson's fraud claim failed as a matter of law under Michigan's

economic loss doctrine, which Thompson conceded barred said claim. The district court applied Michigan law because Michigan was the forum state and it saw no rational reason to apply Ohio law.

Thompson appealed. Thompson argues that the district court overlooked evidence supporting its contract and warranty claims. For instance, Thompson customer Wynne stated that it received claims for under one-half percent of its IG units with aluminum spacers for roughly two decades, but that it received as many as 100 times more warranty claims for Super Spacer units when it started using them. R. at 2533–54, 2536, 2538–39. Similarly, Thompson customer Oxbowindo stated that its failure rate for aluminum IG units was "less than one percent." R. at 2545. Two other Thompson customers stated that the outgassing in the Super Spacer units primarily occurred in windows facing the sun. R. at 2527, 2544. According to Thompson, these statements comport with Howes's opinion that Super Spacer outgasses at or above 60°C. Additionally, Thompson argues that Ohio law applies to its fraud claim and that Ohio's economic loss doctrine does not bar said claim. We have jurisdiction pursuant to 28 U.S.C. § 1291 (2012).

## II.    STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988) (citations omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In determining whether a reasonable jury could return a verdict for the nonmoving party, we "view the evidence and draw all reasonable inferences in favor of the nonmoving party." *Sec'y of U.S. Dep't of Labor v. Gilley*, 290 F.3d 827, 829 (6th Cir. 2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The nonmoving party cannot create a genuine dispute of material fact through "mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (citation omitted) (internal quotation marks omitted).

## III. ANALYSIS

### A. Breach of Contract and Breach of Warranty

The district court held that Thompson submitted insufficient evidence to show that the Super Spacers outgassed or that any outgassing caused the damages detailed in the warranty report. Thompson contends that its circumstantial evidence creates genuine disputes of material fact on the issues of breach and causation. Edgetech responds that Thompson's evidence is insufficient in this regard.

The district court applied Ohio law to Thompson's breach of contract and warranty claims. The Parties agree that Ohio law applies to these claims. Unless otherwise indicated, we treat these claims in tandem as they present overlapping issues.

Under the Ohio version of the Uniform Commercial Code, to prevail on a breach of express warranty claim, the plaintiff must show that: (1) an express warranty exists; (2) the product under warranty is defective; (3) the plaintiff provided the defendant with reasonable notice of the defect; and (4) the plaintiff suffered an injury as a result of the defect. *See Litehouse Prods., Inc. v. A.M.I. Int'l, Ltd.*, No. 46834, 1984 WL 4539, at * 3 (Ohio Ct. App. Mar. 8, 1984); *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 753 (N.D. Ohio 2010) (citations omitted); *cf.*

Ohio Rev. Code Ann. § 1302.27 cmt. 13 (LexisNexis 2012) ("In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained."); *Drayton v. Jiffee Chem. Corp.*, 591 F.2d 352, 359 (6th Cir. 1978) (stating that "breach of an express warranty, if causally related to the injury, [is] actionable" under Ohio law).

In this case, Thompson's evidence was insufficient for a reasonable juror to conclude that the Super Spacer units were defective. Manser conceded that the warranty report was only his best guess as to the identity and number of the defective Super Spacer windows. Furthermore, Manser acknowledged that the report did not show whether the listed windows had foam or aluminum spacers, and Thompson's customers stated that some of the listed windows had aluminum spacers. Therefore, although some of the windows in the report could have contained defective Super Spacer, a juror would have to rely on "mere speculation, conjecture, or fantasy" to so conclude. *See Lewis*, 355 F.3d at 533.

The evidence was also inadequate to reasonably conclude that Super Spacer caused the windows to outgas. Thompson failed to preserve the windows in the warranty report and the report does not list the five windows that Howes visually examined and determined failed due to outgassing. R. at 1458, 1821. Consequently, Thompson failed to present expert testimony on (1) whether the windows in the report outgassed and (2) whether Super Spacer caused the alleged outgassing. Although Ohio law does not always require expert testimony to prove that a design is defective, the causation issues here are too complex for the jury to decide without the help of expert testimony. *Compare Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784, 793–94 (1984), *with Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 529 (6th Cir. 2012). Even Howes stated that he did not know why the windows in the report failed. R. at

2269. Furthermore, although Howes visually examined five other windows and concluded that Super Spacer caused them to outgas, he stated that determining whether the fog was outgassing or mere "water fog" required a "destructive" test. R. at 1285, 1364, 1867. Heather Abbas, Thompson's director of quality, agreed that a destructive test was required. R. at 1891–92. Hence, it is unclear how a rational juror could conclude that Super Spacer caused the five visually examined windows to outgas.

Thompson contends that its circumstantial evidence creates triable issues on breach and causation. To that end, Thompson points to evidence purporting to prove that: (1) both EPDM and Super Spacer outgas; (2) Super Spacer field failures were heat-related as Howes predicted; (3) Super Spacer units failed much more than aluminum units; (4) Super Spacer was incompatible with polysulfide; and (5) Thompson has sound workmanship. We recognize that circumstantial evidence may suffice in some cases to show that a defective product caused a given injury. *Rayco Mfg., Inc. v. Deutz Corp.*, 497 F. App'x 515, 518 (6th Cir. 2012) (citing *State Farm Fire & Cas. Co. v. Chrysler Corp.*, 523 N.E.2d 489, 493–94 (Ohio 1988)). However, we disagree that Thompson's circumstantial evidence creates genuine issues for trial. Thompson's counterargument overlooks the obvious. There is not enough evidence to reasonably conclude that the windows Thompson designates as defective contained Super Spacer. In any event, evidentiary items (1) – (3) share an infirmity: Thompson's and Howes's failures to preserve pertinent evidence and data preclude meaningful comparative analysis. It is unclear that the properties of the EPDM and Super Spacer that Howes tested are comparable to the Super Spacer at issue; that the Super Spacer units and aluminum units were alike in all material respects; that the sunny conditions under which the Super Spacer at issue failed were similar to Howes's laboratory conditions; and so on. *Cf. Glastetter v. Novartis Pharms. Corp.*, 252 F.3d

986, 990 (8th Cir. 2001) (citation omitted) (stating that "[e]ven minor deviations in molecular structure can radically change a particular substance's properties and propensities"). As to item (4), although there may be evidence supporting the inference that Super Spacer is incompatible with polysulfide, Thompson opted to use polysulfide as a secondary sealant and applied it to the IG units itself. Thus, item (4) does not indicate that the Super Spacer at issue was defective when Edgetech shipped it. Concerning item (5), while Thompson arguably submitted evidence from which one could infer that it had sound workmanship overall, sound workmanship alone is generally insufficient to show breach of express warranty by a parts supplier. Therefore, the evidence was insufficient for a rational juror to conclude that the Super Spacer windows were defective or that Super Spacer caused any observed outgassing. Accordingly, the district court did not err in granting summary judgment on Thompson's interrelated claims for breach of warranty and breach of contract.

**B.      Fraud**

Thompson asserts a fraud claim based on Edgetech's alleged misrepresentation that polysulfide was a suitable secondary sealant to use with Super Spacer. The district court applied Michigan law to Thompson's fraud claim and concluded that Michigan's economic loss doctrine barred it. Thompson concedes that Michigan law would bar its fraud claim. Appellant's Br. at 37; R. at 1977. Thus, we have no occasion to address this issue. Nevertheless, Thompson argues that the district court should have applied Ohio law to its fraud claim and that Ohio's economic loss doctrine does not bar said claim. We review a district court's choice-of-law determination *de novo*. *Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014) (citing *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002)).

"Federal courts sitting in diversity must apply the choice-of-law rules of the forum state." *Muncie Power Prods., Inc. v. United Techs. Automotive, Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citations omitted). Michigan courts "apply Michigan law unless a 'rational reason' to do otherwise exists." *Sutherland v. Kennington Truck Serv., Ltd.*, 562 N.W.2d 466, 471 (Mich. 1997) (quoting *Olmstead v. Anderson*, 400 N.W.2d 292, 302, 305 (Mich. 1987)). Michigan courts employ a two-step approach to determine whether there is a rational reason to displace Michigan law. *Id.* First, the court "must determine if any foreign state has an interest in having its law applied." *Id.* "If no state has such an interest, the presumption that Michigan law will apply cannot be overcome." *Id.* But if a foreign state has an interest in applying its law, the court "must then determine if Michigan's interests mandate that Michigan law be applied[] despite the foreign interests." *Id.* "Although this balancing approach most frequently favors using [Michigan law], Michigan courts nonetheless use another state's law where the other state has a significant interest and Michigan has only a minimal interest in the matter[.]" *Hall v. Gen. Motors Corp.*, 582 N.W.2d 866, 868 (Mich. Ct. App. 1998). The following nonexhaustive list of considerations informs this determination: (1) whether the injury occurred in the state whose law a party seeks to apply, *see Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 695, 698 (6th Cir. 2013); *Radeljak v. Daimlerchrysler Corp.*, 719 N.W.2d 40, 46 (Mich. 2006) ("'[There] is a local interest in having localized controversies decided at home.'" (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947))); (2) the extent to which the relevant commercial activity took place in the state whose law a party seeks to apply, *see Standard Fire*, 723 F.3d at 699; (3) whether a party seeks to defeat the application of the law of its home state, *Olmstead*, 400 N.W.2d at 304 ("Since defendant is a citizen of Michigan, there can be no serious argument that applying Michigan law will defeat his expectations."); (4) the forum state's interest in applying its own law, *Radeljak*,

719 N.W.2d at 46 ("'[There] is an appropriateness . . . in having the trial . . . in a forum that is at home with the state law that must govern the case . . . .'" (quoting *Gilbert*, 330 U.S. at 509)); (5) whether the law of the foreign state would entitle the party to greater relief than the law of the party's home state, *cf. Standard Fire*, 723 F.3d at 698 ("Michigan was deemed to have no interest in affording greater rights of tort recovery to a Tennessee resident than would Tennessee law."); *Frydrych v. Wentland*, 652 N.W.2d 483, 486 (Mich. Ct. App. 2002) (citation omitted) ("Michigan has little or no interest in affording greater rights of tort recovery to a foreign state resident than those afforded by the foreign state."); and (6) whether courts in the foreign state whose law the party seeks to apply would apply Michigan law, *Sutherland*, 562 N.W.2d at 473. To be expeditious, we go directly to step two.

Here, Michigan's interests in applying its law to Thompson's fraud claim dwarf any countervailing interests on Ohio's part. Although Edgetech made the alleged misrepresentation in Ohio, the vast bulk of the outgassing (i.e., the alleged injury) took place in Michigan. Likewise, while Edgetech manufactured the Super Spacer in Ohio, the other relevant commercial activity primarily took place in Michigan. For instance, Thompson relied on the alleged misrepresentation in Michigan by entering into the Contract at its Fenton office, *see* R. at 1816, issued purchase orders and payment in Michigan, and manufactured the defective IG units in Michigan. Furthermore, most of Thompson's customers are located in Michigan, the units failed largely in Michigan, and Thompson's remedial efforts took place in Michigan. As to factors (3) and (4), Michigan's interests outweigh Ohio's because Thompson is a Michigan company and the district court had a general interest in applying Michigan law. Regarding factor (5), Thompson seeks the application of Ohio law to obviate an unfavorable outcome under Michigan law. Although Thompson could counter that Edgetech also seeks a favorable outcome

under the law of another state, Edgetech is a foreign defendant seeking the application of the law of the forum state. Thus, Edgetech's conduct does not suggest "law shopping." *Cf. Ferens v. John Deere Co.*, 494 U.S. 516, 539 (1990) (Scalia, J., dissenting). As for factor (6), Ohio conflict-of-law rules would mandate the application of Michigan law. Under Ohio law, "a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit." *Morgan v. Biro Mfg. Co., Inc.*, 474 N.E.2d 286, 289 (Ohio 1984) (citing Restatement (Second) of Conflicts of Laws § 146 (1971)). Where, as here, the alleged tort occurred in more than one state, "the place of the wrong is the state where the last event necessary to make the actor liable took place." *Bailey v. Chattem, Inc.*, 684 F.2d 386, 392 (6th Cir. 1982) (applying Tennessee law) (citation omitted) (internal quotation marks omitted). "Under this *lex loci delicti* approach, '[when] a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made.'" *Id.* (quoting Restatement (First) of Conflicts of Laws § 377 n.4 (1934)). Thus, because Thompson sustained the alleged loss in Michigan, Michigan law applies to Thompson's fraud claim. Accordingly, the district court did not err in granting summary judgment on Thompson's fraud claim.[7]

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[7] Thompson also suggests that the Contract contains a choice-of-law clause requiring the application of Ohio law to its fraud claim. However, choice-of-law clauses are not invariably enforceable under Michigan law. *See Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 739 (6th Cir. 1999) (citation omitted). Moreover, under the circumstances of this case, the provision that the Contract "shall be governed by the laws of the State of Ohio" appears to be sufficiently narrow to exclude Thompson's fraud claim, which lacks a sufficiently close relationship to the Contract.